IN THE MATTER OF MARTIN L. BLATT,
AN ATTORNEY-AT-LAW.

Argued May 21, 1974—Decided July 30, 1974.

*Mr. John H. Mead and Mr. Ronald L. Taht* argued the cause for the Cape May County Ethics Committee.

*Mr. Josiah E. DuBois, Jr.,* argued the cause for respondent.

PER CURIAM. The Cape May County Ethics Committee has submitted a two count presentment to this Court with respect to the alleged unethical conduct of respondent, Martin L. Blatt, an attorney at law of this State. The charges set forth in the respective counts are unrelated and we will consider them separately.

### FIRST COUNT

In the summer of 1971 a United States Grand Jury undertook an investigation of alleged municipal corruption in the

City of Atlantic City and in Atlantic County generally. The investigation came to focus upon the reputed wide-spread practice on the part of contractors and others engaged in public work of paying kickbacks to municipal officials.

At the time of the investigation and for some years past, one Patrick J. Doran was and had been engineer for Atlantic County. Doran was later indicted, tried and convicted of extortion in the United States District Court for the District of New Jersey.[1] The conviction rested upon evidence of corrupt and collusive arrangements between Doran and certain engineers and contractors for the payment of kickbacks. There was abundant proof that numerous such payments had in fact been made by firms and corporations engaged to do work for Atlantic County. Prominent among those making such payments was the engineering firm of Kammerer, Symes & Associates.

In October 1971 a meeting took place at the Cherry Hill offices of the Kammerer firm. It was attended by Doran, by respondent, acting as Doran's attorney, and by Kammerer and Symes. The Kammerer office had for a number of years been rendering substantial engineering services to Atlantic County as well as to other counties and various municipalities in the southern part of the state. According to the testimony of both Blatt and Doran, the latter told the former that he had done work for the Kammerer firm, for which he had been paid, during the period that he was also acting as engineer for Atlantic County. At the same time, the engineering office had been performing services for the county for which they had received compensation. Doran told respondent he was fearful that his having received payments from the engineering firm under such circumstances might suggest a conflict of interest which could prove personally harmful or

---

[1]His sentence was thereafter affirmed by the United States Court of Appeals for the Third Circuit. United States v. Doran, 480 *F*. 2d 919 (1973). The United States Supreme Court denied *certiorari*. 414 U. S. 910, 94 *S. Ct.* 232, 38 L. Ed. 2d 148 (1973). .

embarrassing to him. Both Doran and respondent deny that at that time Blatt had any knowledge of the kickback arrangements. The Ethics Committee accepted this testimony as truthful.

At the October meeting Blatt asked leave to review the books, cancelled checks, receipted invoices and other documents relating to the work that his client had done for the firm. These were made available and Blatt studied them. He was apparently satisfied except as to one detail. While respondent denied the charge, there is seemingly conclusive evidence that he removed from the file an invoice dated August 1, 1968, which had been submitted by Doran to the engineering firm, in the amount of $9,000. The invoice had been previously paid. Blatt is said to have stated that he wished to add the word "surveying," so that the statement, as so revised, would read, "To Bill your account for Surveying work performed — $9,000." Following these instructions, Doran some time thereafter submitted a new invoice identical to the original one, except that the word "surveying" was included. The revised invoice was sent to the Kammerer firm. Kammerer receipted it as of August 2, 1968 and directed his secretary or bookkeeper to stamp it with the various notations that had appeared upon the original document.

At the meeting, after this incident, there followed a discussion of the federal investigation that all those present knew was taking place. Blatt, according to both Kammerer and Symes, suggested to them that in the event they were questioned by federal authorities — an eventuality which then seemed likely — they should be uncooperative and say as little as possible. In the federal trial in which Doran was later convicted of extortion, Kammerer, after receiving a grant of immunity, testified under oath as to this conversation in these words:

He [Blatt] indicated not to say anything or to offer any information. He indicated if we were, our records were subpoenaed, that the Federal Attorneys would use certain tactics to attempt to get us to answer their questions, and that we should keep our mouths shut.

The testimony of Symes was entirely corroborative.

The Ethics Committee concluded that a statement, substantially as set forth above, was in fact made by respondent. A careful study of the record before the Ethics Committee, including the testimony of Kammerer at the federal trial, convinces us that this conclusion, despite defendant's denial, was inescapable.

We therefore conclude that Blatt did substitute a new and altered invoice for the original and that he did urge Kammerer and Symes, obviously potential witnesses in connection with the ongoing investigation, to cooperate as little as possible with the Federal authorities. It is our opinion that each of these acts constituted a violation of the ethical standards governing the conduct of attorneys.

We are mindful that at the October meeting Blatt was acting for his client, Doran, and that it is the duty of an attorney to represent his client with zeal and vigor. But there are boundaries beyond which an attorney may not go and respondent's conduct transgressed these limits.

It is urged in respondent's behalf and also suggested by the Ethics Committee that neither of these criticized acts in any way inhibited the administration of justice. Fortunately this is true, but it does not excuse the derelictions. The falsification of records, especially when there is a strong likelihood that they may later be examined in the course of an investigation or judicial proceeding, is on its face improper conduct. Its only purpose is to mislead. And Blatt's admonition to Kammerer and Symes, neither of whom was his client, not to cooperate with the federal authorities, can only be understood as an attempt to deny evidence to law enforcement officials. We find Blatt's actions constituted "conduct prejudicial to the administration of justice," in violation of DR 1–102(5).

## SECOND COUNT

In February, 1970, respondent was approached by David E. Feinstein and George F. Roberts in connection with the

proposed sale of a piece of property in Somers Point. Both Feinstein and Roberts were licensed real estate brokers and each was interested in bringing about the sale. At the time, Roberts was the mayor of Somers Point. The owners of the property were John and Petronella Woodburn; the proposed purchaser was James Aversano. Respondent stated, and the Ethics Committee found, that he represented Feinstein and Roberts, but that no attorney-client relationship existed with either seller or purchaser. Despite the fact that he represented neither party to the transaction, and had at the time no communication with either of them, he nevertheless went forward with the preparation of contracts of sale. These took a very unusual form. There was first prepared a contract naming Mr. and Mrs. Woodburn as sellers and leaving blank the name of the purchaser. The consideration was stated to be $95,000. There was then prepared a second contract wherein Mr. Aversano appeared as purchaser, while the name of the seller was left blank. The stated consideration in this agreement was $120,000.

On their face the documents suggest impropriety if not outright illegality. Why should two contracts, prepared simultaneously, obviously designed to permit the interposition of a straw man, contain a $25,000 disparity as to purchase price?[2]

Some time after title closed the facts were discovered by the sellers. They instituted suit agaist all parties involved and respondent contributed to the financial settlement that followed. The Ethics Committee exonerated respondent as to this phase of the Second Count. We cannot agree. On the contrary we think respondent's conduct to have been highly unprofessional.

---

[2]After these contracts had been delivered to Mr. Roberts, they were revised, apparently in his office. The names of the straw men were inserted in each contract, and other provisions were included. The contracts were then signed by the various parties. Except for these additions the executed agreements were substantially the same as those prepared by respondent.

A lawyer may not follow the directions of a client without first satisfying himself that the latter is seeking a legitimate and proper goal and intends to employ legal means to attain it. It is no excuse for an attorney to say that he only did what he did because directed to do so by his client. The propriety of any proposed course of action must be initially considered by the attorney, and it may be thereafter pursued only if the lawyer is completely satisfied that it involves no ethical compromise. It is for the lawyer, not the client, to make this decision. Respondent's utter insensitivity to these considerations is manifest in a statement made to the Ethics Committee.

As to the transaction, I wouldn't ask any questions. I would do what these fellows, who are twice my age, advise me, requested me to prepare.

No satisfactory explanation was ever given, either by respondent or by any other witness, as to why the contractual arrangements described above took the form they did. Respondent's duty, upon being requested to draft the aforementioned agreements, was to learn all the details of the proposed transaction. Only then, upon being satisfied that he had indeed learned all the facts, and that his client's proposed course of conduct was proper, would he have been at liberty to pursue the matter further. Respondent's conduct fell far short of that required of a member of the bar of this State.

We take this occasion to call attention to a further problem which the facts of this case suggest. Here respondent was retained by and acted for real estate brokers who hoped to benefit from the proposed transaction. He represented neither of the principals — seller or purchaser. Yet he drew contracts fixing the rights and obligations of the parties to a transaction of considerable importance to each.

In representing the broker, in a typical vendor-purchaser transaction, to whom does an attorney owe responsibility or allegiance? The interest of the broker is to make sure that

the sale eventuates and that he receives his commission. It goes no further. Of course if seller and purchaser each have independent counsel to review the proposed agreement, there is no problem. But suppose one or other does not, and the agreement of sale is executed and delivered by the parties? Their rights and obligations will have been determined by the terms of a contract drawn by a lawyer who acted in the interest of neither. In preparing the agreement he could not have thought primarily of protecting either seller or purchaser, but rather of furthering the interest of his client — the broker. In so doing he might be led to gloss over controversial points or fail to raise issues which might provoke disagreement between the parties. Should it be deemed ethical for an attorney to do this? While we entertain grave doubts, we find it unnecessary to resolve the issue here.

Upon another phase of this transaction the Ethics Committee found respondent to have violated *DR* 5–105, which broadly forbids an attorney from representing conflicting interests, except under carefully confined circumstances, which admittedly did not exist here.[2]

---

[2] The Cape May County Ethics Committee measured Blatt's conduct by the provisions of *DR* 5–105 which became effective on September 13, 1971. Blatt's acts, however, occurred in the early part of 1970. Therefore Canon 6, the predecessor of *DR* 5–105 was applicable. Canon 6, similar in its provisions to *DR* 5–105, provided:

6. *Adverse Influeneces and Conflicting Interests*

It is the duty of a lawyer at the time of retainer to disclose to the client all the circumstances of his relations to the parties, and any interest in or connection with the controversy, which might influence the client in the selection of counsel.

It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.

The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subse-

It was at all times understood that the proposed sale was contingent upon the purchaser, Aversano, procuring the transfer of a liquor license for use at the premises to be purchased. At all relevant times respondent was solicitor for the City of Somers Point. Municipal approval of the transfer of the liquor license was necessary. Yet respondent drafted the agreement for the sale and transfer of the license, to which Aversano and the then holder of the license were the parties. This work also seems to have been performed for the brokers, Feinstein and Roberts. Blatt thereafter gave advice as to how the transfer should be undertaken, both to other attorneys representing the parties, and to the municipal council which eventually approved the transfer. For instance, the minutes of the Council meeting of April 29, 1970 indicate that a debate over the proposed license transfer took place. The portion of the minutes that refers to this matter contains the following statement:

Mr. Blatt advised Council on certain points of the various laws.

Blatt rendered such advice knowing the agreement providing for the transfer of license was his own work product.

Respondent's insensitivity to the ethical requirement that conflicts of interest be avoided is the more distressing because this is not the first time that such a violation on his part has been brought to our attention. See *In re Blatt*, 42 *N. J.* 522 (1964).

The totality of respondent's conduct, exposed by the record and condensed above, cannot of course be allowed to go uncensured. The measure of discipline is always difficult to decide. We conclude that respondent should be suspended from the practice of law for two years and until the further order of this Court. Judgment to that effect will be entered. .

---

quent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed.

*For suspension for two years*—Chief Justice HUGHES and Justices JACOBS, MOUNTAIN, SULLIVAN, PASHMAN and CLIFFORD—6.

*Opposed*—None.

---

It is ORDERED that MARTIN L. BLATT of Atlantic City be suspended from the practice of law for two years and until further order of the Court, effective August 15, 1974; and it is further

ORDERED that the said MARTIN L. BLATT, be and hereby is restrained and enjoined from practicing law during the period of his suspension.