## IN THE MATTER OF FREDERICK THOMPSON, AN ATTORNEY-AT-LAW.

Argued January 7, 1975—Decided March 19, 1975.

*Mr. Robert E. Cowen,* Chief, Central Ethics Unit, Administrative Office of the Courts, petitioner, argued the cause *pro se.*

*Mr. Benjamin Asbell* argued the cause for respondent (*Messrs. Asbell, Ambrose, Ergood & Asbell,* attorneys).

PER CURIAM. This matter was brought before the Court on the petition of the Chief of the Central Ethics Unit, Administrative Office of the Courts, for the appropriate discipline of respondent for alleged serious violations of the Code of Professional Responsibility. Petitioner acted in the belief that the disposition of the matter recommended by the Gloucester County Ethics Committee — a letter of reprimand from the Committee to respondent — was unduly lenient in the light of the nature of the evidence as to the offenses.

The matter arises out of the representation by respondent of one Tallman on a charge by the Deptford Township police against Tallman of driving while under the influence of alcoholic beverages in May 1971. Tallman and respondent had five or six meetings between that time and September 1971 at which terms and conditions of the representation and the progress of respondent's work in the matter were discussed. Tallman's account of the matter, given at two hearings conducted by the Ethics Committee, the second subject to severe cross-examination by counsel for respondent, was that respondent quoted him a fee of $500, but said either at that or the ensuing meeting that the matter would cost Tallman two or three times that sum, and that respondent informed him at their next meeting after that discussion that Tallman would have to pay a total of $2500. Of this, $2000 would be distributed between the local judge, the township prosecutor, the arresting police officer and a sergeant of police. In return for this, respondent guaranteed that the penalty would not exceed a small fine for careless driving, the respondent undertaking to repay an unspecified

portion of the extra $2000 should Tallman's license be revoked for any period. Tallman was anxious to avoid any revocation as his job as a truck driver depended on his driving license. Although Tallman paid the $500 retainer in the beginning, respondent insisted that the entire $2000 balance be paid prior to the municipal court hearing, and since Tallman was having difficulty raising it respondent kept adjourning the hearing. The case was finally removed from the jurisdiction of the Deptford municipal court after the matter of respondent's alleged impropriety came to the attention of the Gloucester County Prosecutor's Office, and Tallman was ultimately convicted of the statutory driving violation in the county court.

In August 1971 the Gloucester County Prosecutor and the State Police induced Tallman to attend a meeting with respondent at the latter's office wearing a secret electronic recording device monitored by the police in a nearby automobile. The meeting took place August 11, 1971, and a transcript of the tape of the purported recording made by the Gloucester County Prosecutor's Office, marked Exhibit B, is attached to the petition herein. Tallman was accompanied by his wife, and some of respondent's recorded remarks were addressed to her. The purported purpose of the meeting was for Tallman to bring respondent $1200 of the additional money demanded by him. Tallman told respondent the money had been furnished by his brother-in-law, but in fact it was supplied by the police. Tallman was instructed by the police to draw respondent out in substantiation of the alleged previous proposal for Tallman to advance funds for distribution to the officials mentioned above.

The crux of the issue before us is whether the substance of the recorded tape of the meeting of August 11, in the light of Tallman's direct inculpatory testimony, and as against respondent's flat denial of the alleged corrupt proposal and his explanations before the Ethics Committee and this Court of the "intent" of his seemingly incriminatory

admissions on the tape, establishes respondent's guilt of the charges laid in the petition by clear and convincing proof. *In re Pennica,* 36 *N. J.* 401, 419 (1962).

Respondent's testimony on the charge of the petition is in substance as follows. Tallman called upon him to represent him in the drunk-driving matter. He reviewed the facts with Tallman and investigated the police file. He was encouraged to find that the police report of Tallman's refusal to take a breathylizer test had not been forwarded to the State Motor Vehicle Department in Trenton, as its receipt there would have been followed by an automatic six-months driving suspension. Moreover, as the police had not administered any Romberg tests to Tallman on the occasion of the arrest, he felt, and told Tallman, he was confident of an acquittal. He required of Tallman a $500 payment as a retainer, but indicated from the outset that the total fee could go as high as $2500, depending on the work and time involved and the results obtained. *Cf.* Disciplinary Rule DR 2–106(C). Respondent categorically denied having made any proposal for money to be distributed to public officials.

Respondent voluntarily appeared before the State Grand Jury on March 9, 1973 and testified there in explanation of the suspicious remarks and comments on the August 11, 1971 tape. He was given a copy of the tape to listen to prior to the Grand Jury session, and it was replayed to him before the jury. While he found fault with the prosecutor's stenographic transcript of the tape in respect of accuracy and completeness as to various words or phrases, none of which we find really material to the meaning of any of the compromising segments of the tape, he admitted to the Grand Jury that with those exceptions the tape did "fairly and accurately reproduce the conversation that [he] had with Mr. Tallman." Respondent was not indicted.

To complete the factual record, Tallman returned to respondent's office on August 24, 1971 with the balance of $800 required by respondent. This money was also supplied by the police, and a secret recording of that meeting was also made.

The transcript thereof is quite short, and indicates there was at that time no discussion of the fee arrangements. Tallman testified he was instructed by the police to avoid arousing respondent's suspicions at that meeting. By leave of this court, respondent has recently adduced before the Ethics Committee the testimony of one of the state policemen who made the August 1971 recordings in an attempt to show that either the first or second tape, or both, are affected by substantial omissions of content tending to mitigate the adverse significance of the August 11 tape. Without discussing this testimony in detail, we find it fails to cast any doubt on the substantial accuracy of the August 11 transcript before us as revelatory of the presently material aspects of the meeting of that date.

A recital of all those portions of the August 11 tape which, in our opinion, convincingly corroborate Tallman's charge against respondent would unduly extend this opinion. Mention of the most striking instances will suffice. We detail those only because of respondent's strenuous protestations that his taped remarks are not reasonably construable as in reference to previous arrangements to kill the charge against Tallman.

When Mrs. Tallman inquired as to "where the money's going", respondent said:

The money is going absolutely nowhere, well I can't tell you where it's going you understand that, I mean your husband understands that too. The only thing that I can tell you is that your husband was not sent to me because I'm a blood sucker, your husband didn't come here because I'm a crook and I quoted him the lowest under the circumstances and he is not going to owe this money if I can't succeed. If I don't succeed that's it, *but I've got to be in a position to say that I've had it.* Now I'm a, under normal circumstances I don't even discuss this with anyone else because I've cautioned him so carefully that it shouldn't be discussed no further with anyone. (emphasis added).

Tallman inquired whether, if he could not raise the remaining $800, respondent could cut down the shares of "the officer and sergeant". Respondent answered:

Q. I didn't say that. First of all, the officer and sergeant *whatever they are doing for me or for you or for anybody else*, whatever I'm talking about there is no . . . you can't talk like you just talked, you know, because actually you don't know what thing can be contributed where as far as you're concerned there is . . . my fee is twenty five hundred dollars ($2,500.00) this is [*sic; ? "no"*] part of your concern. *How much of this is applied where is completely immaterial and there may be one or just one or someone that may get nothing*, it's like in a firing line, you know, where one guy controls the other where there are twelve rifles but only six of them have bullets. (emphasis added).

A. Umhm.

Q. And it's got to be that way for obvious reasons because you can't point your finger at anybody and say hey you got something.

Later respondent informed Mrs. Tallman that he had told her husband he had "to have the money before we go to court * * * I am on his side, but by the same token I have certain commitments that I must make * * *".

Respondent reminded Mrs. Tallman that a second offense meant a mandatory jail term and a ten-year license revocation — hazards from which respondent was "saving" Tallman. He continued:

Now the only possibility of backing out is that if some witness would somehow like to refuse. But so far they have not. *I have everything stopped in its tracks * * *. I can only tell you this much that my end was taken care of as of a week ago * * *.* The only way there would be any changes is if they decide that we're playing games. (emphasis added).

Respondent admits that in two or three of the excerpts quoted he used "bad language" but asserts that everything he said was intended to refer only to the progress of his defense of the case and his arrangements for trying it; and that his insistence on being paid in full in advance represented his uniform prudent practice of being assured of compensation in criminal cases in advance of trial. If there were only an isolated remark of the nature quoted, a fair judicial reaction in the light of the awesome consequences

to respondent of an adverse determination would be to give him the benefit of any doubt. But we have before us a mosaic of mutually corroborative remarks generating devastating probative force. Indeed we find it impossible, upon a reading of the transcript in its entirety, notwithstanding respondent's palliative explanations of what he "meant" to say, not to be thoroughly convinced that respondent had in fact, as Tallman unequivocally testified, previously proposed to him the use of money to influence law enforcement and judicial officials in their disposition of the case.

Respondent points to the testimony of the Deptford judge and prosecutor and of the local police that no money was paid or tendered them by him.[1] This, however, misses the point of the charge and exacerbates the nature of respondent's conduct. His proposals to Tallman were not only reprehensible of themselves, in sullying a layman's impression of the legal profession and the judicial process, but constituted also a dishonest attempt to inflate his fee by fictitious expenses.

We find petitioner has satisfactorily established his charge of violation by respondent of Disciplinary Rules DR 1–102 (3), (4), (5) and (6); of DR 7–102(A)(8); of DR 9–101(C); and of DR 7–102(A)(7). See *In re Brady*, 64 *N. J.* 100 (1973). We find no violation of DR 3–102, or DR 7–109(C), as charged.

█ In a post-argument brief respondent contends that he has a vested right not to be disciplined more severely than the reprimand recommended by the Gloucester County Ethics Committee. This is based on the fact that when the misconduct took place, in 1971, then Rule 1:20–5 authorized an ethics committee to privately reprimand an attorney where it dismissed an ethics complaint as unfounded but

---

[1]Note, however, that the arresting officer testified that respondent had approached him and asked whether he "could put in a good word for the guy" and that he advised respondent he could not because Tallman had tried to bribe him at the scene of the arrest.

nevertheless was of the opinion that his conduct was not in the best interest of his client or of the public or the legal profession. Respondent asserts that this was, in effect, the action here taken by the Committee in April 1974 as it found itself "unconvinced of unethical conduct" on respondent's part but recommended censure because "the fee which [he] charged was so greatly in excess of that which is usually charged in this area that [his] failure to justify it encouraged the client to persist in * * * his preconceived expectation that some of the fee would be used for unlawful purposes". However, the Committee did not act under the authority of the cited rule, which had been amended in the interim, but pursuant to its present power, under the amended rule, merely to report to the Court that conduct of a respondent found not to be unethical was nevertheless not in the best interest of his client, or the public, or the legal profession. Of course our conclusions aforestated amount to a flat disapproval of the Committee's determination that respondent's conduct was not unethical.

Respondent's argument is frivolous. Even the former version of the rule did not contemplate that an ethics committee's partial absolution of a lawyer on an ethics charge could shield him from review of that determination before the Court at the instance of any proper party in interest asserting the proposed disciplinary action to be inadequate, or, indeed, on the Court's own motion. See *In re La Duca,* 62 *N. J.* 133, 136 (1973). Respondent's citation of *In re Blatt,* 65 *N. J.* 539, 546 n. 2 (1974), is inapposite.

 Having determined the matter of guilt adversely to respondent, we are faced with the grave matter of assessing disciplinary sanctions. Taken on principle, the nature of respondent's conduct is such as could well warrant disbarment. That conduct was calculated to breed a public image of corruption of judicial administration at its most sensitive point — the local level. *In re Spitalnick,* 63 *N. J.* 429, 432 (1973).

We are, however, presented with a record of apparently spotless behavior by respondent over a 20 year career at the bar. His standing in the legal community is reflected by the fact that he was about to be chosen vice-president of the county bar association when this matter arose. An impressive array of testimonial certifications as to respondent's character from both lawyers and laymen of standing in the community has been submitted to the Court. Born abroad, respondent served with distinction in the armed forces of the United States in World War II, and received citations therefor. During the war he sustained a severe back injury and contracted malaria. There is medical evidence of several present chronic illnesses, including diabetes, some of which have apparently been aggravated by the emotional tension of the unusually protracted period during which these proceedings have been pending.

In all the circumstances we think that the interests of the public in this matter will be properly served by the suspension of respondent from the practice of law for a period of three years and until the further order of this Court. The $2500, which respondent deposited with the ethics committee in October 1971, is to be returned to Tallman and the State Police in the proportions respectively contributed by them. It is so ordered.

*For suspension for three years* — Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN and CLIFFORD and Judge CONFORD—6.

*Opposed* —None.

## ORDER

It is ordered that Frederick Thompson of Woodbury be suspended from the practice of law for three years and until further order of the Court, effective April 2, 1975; and it is further

Ordered that Frederick Thompson be and hereby is restrained and enjoined from practicing law during the period of his suspension.