IN THE MATTER OF DAVID COHN AND ALBERT L. COHN,
ATTORNEYS-AT-LAW.

Argued September 30, 1965—Decided January 10, 1966.

*Mr. Leonard I. Garth* argued the cause for the order.

*Mr. Jerome C. Eisenberg* argued the cause for respondents (*Messrs. Clapp & Eisenberg,* of counsel).

The opinion of the court was delivered by

HANEMAN, J. After investigation and hearing the Passaic County Ethics Committee filed a presentment with this court against David Cohn and Albert L. Cohn. We issued an order to show cause why they should not be disbarred or otherwise disciplined.

The presentment consists of four counts, the last composed of five separate parts. With the exception of the third part of the last count all of the charges are directed at Albert L. Cohn. Said third part concerns both Albert and David Cohn.

We shall treat initially of the charges as they apply to Albert Cohn.

I.

In the first count Albert Cohn is charged with the violation of *Canons of Professional Ethics, Canons* 15, 16, 31 and 32, in that he allegedly assisted, cooperated and participated in the filing of a criminal charge by a client in order to obtain an advantage in a civil suit.

The facts as elicited at the hearing before the Passaic County Ethics Committee are as follows:

The firm of David and Albert Cohn had for some years prior to 1960 represented Marie Rigoletti, who was then operating a tavern known as Mountain View Inn in Wayne, which she had been operating for upwards of 20 years. The tavern was owned by Mar-Bel, Inc., the stock of which was owned largely by her. On December 26, 1960 Carrie Hollan-

der, who had been a patron, fell in front of the tavern and injured herself. Carrie Hollander, with her husband, John Hollander, joining *per quod,* filed suit in July 1961 against Mar-Bel, Inc. and Rigoletti, individually and trading as Mountain View Inn. One of the issues in that suit was the marital status of John Hollander. There is considerable dispute between Cohn and Rigoletti as to how and when the question concerning the marital status of Carrie and John Hollander originated.

During the taking of an oral deposition of Carrie Hollander on April 18, 1962 in connection with her suit against Rigoletti she admitted that she had been married to Joe Carey before her marriage to John Hollander in Baltimore, Maryland. She admitted that a Mexican divorce obtained against Carey was "no good." In answer to Albert Cohn's question "You are saying that you are not legally married to John Hollander?" she replied, "that's right."

Cohn testified that Rigoletti, from early in July 1961 was "hostile and vehement in her hostility towards Carrie Hollander" for having brought suit. He stated that "she would use curse words towards her, words that were just not only unattractive and unkind, but filthy language, describing Carrie Hollander." He further testified that Rigoletti said it was common knowledge that John Hollander was not Carrie Hollander's husband and "that Carrie Hollander and John Hollander had a lot of nerve in bringing this type of an action when, actually, they weren't married." Rigoletti denied making any such statement and asserted that her knowledge of Carrie's marital status came from Cohn after the taking of the Carrie Hollander deposition.

There is a further controversy between Cohn and Rigoletti about the inception of the idea to lodge a criminal complaint against Carrie Hollander charging her with bigamy. The gist of Cohn's testimony was that the idea originated with Rigoletti and that he tried to dissuade her. Rigoletti testified that Cohn persuaded her, over her objection, to file the complaint in the hope that Carrie Hollander would drop her suit. In

any event, a complaint was eventually signed by Jack Brosh, Rigoletti's bartender, at the instigation of either Cohn or Rigoletti or both.

The facts attending the signing of the complaint and the trial thereof, as elicited from witnesses other than Cohn and Rigoletti, are most illuminating on the question of the activities of Cohn in connection with the bigamy charge. Mrs. Naughton, the clerk of the Wayne Municipal Court, stated that in the middle of April of 1962 Brosh appeared in her office and tried to file a bigamy complaint against Carrie Hollander. She testified that "he seemed rather vague * * *. He said he would have to see Marie Rigoletti," and no complaint was filed at the time. She received a call from Rigoletti asking about the case. Naughton told her that the case would not proceed or be processed until she was advised of the specific statute, allegedly violated, so that she could insert a reference to it in the complaint. She testified that she later had a phone conversation with someone in the office of David Cohn and Albert Cohn. She did not remember to whom she spoke or the date of the conversation. She did recall that she had previously received a letter from the Cohn office. Cohn admits the phone call but disputes that he sent the letter before he talked with the clerk. The letter reads as follows:

> "May 3, 1962
> Re: Hollander vs. MarBel
> Our File No. 19,313

Violations Clerk
Wayne Township Municipal Court
Wayne, New Jersey
Dear Sir:

In answer to your inquiry please be advised that Carrie Hollander went through a ceremony of marriage with John Hollander on September 19, 1949 in Baltimore, Maryland. At the time she was still lawfully married to one, Joe Carey of Boonton, New Jersey.

This was admitted by her in sworn testimony on April 18, 1962, before Herman Edelstein, a certified shorthand reporter.

> Very truly yours,
> DAVID & ALBERT COHN
> BY ------------------------------------------------
> Albert L. Cohn."

She stated as a result of the call she noted a memorandum on the letter, which reads "Lawyer's Request 92.1." She indicated that that "was the section of the law under which he wanted the complaint brought," and concluded from the presence of the memorandum on the letter that "the call must have been after May 3rd." (*N. J. S.* 2A:92–1 is the bigamy statute.) Naughton further testified that she was concerned with the question of jurisdiction as well as the proper statute because the letter she received from Cohn said the second marriage took place in Baltimore.

The deputy court clerk of Wayne Municipal Court, Mrs. Schmidt, testified that she spoke to Cohn on May 4, 1962 to check the wording of the bigamy complaint. She made a notation of the conversation, dated May 4, 1962, as follows:

"Carrie Hollander. Read wording of complaint to Albert L. Cohn, att. for Jack J. Brosh. He said it was O. K. He gave me the date of Dec. 26, 1960 to be filled in. I asked him if we had jurisdiction on this and he said we did."

Cohn denies receiving a call on May 4, 1962 and further denies ever having mentioned "bigamy" or referring to any section of the statutes in conversation with anyone in the clerk's office. He testified that on May 4, 1962, which was a Friday, he was in court dealing with motions.

The deputy clerk received a letter from Albert Cohn dated May 21, 1962, which reads:

"Clerk, Municipal Court
Wayne Township
New Jersey

Re Hollander vs. Mar-Bel
Our File: No. 19,313.

Dear Sir:
Would you kindly tell us the status of the complaint made by Mr. Jack Brosh in the above matter.
Your prompt attention would be appreciated.
We should like to be notified of the hearing date so that we can be present. We have information in our file which will be of valuable assistance to the State.

Very truly yours,
David and Albert Cohn
by Albert Cohn."

Mrs. Schmidt does not recall calling Cohn in response to said request but stated "I must have called because Mr. Brosh came in shortly thereafter to sign the complaint."

On May 22, 1962 Jack Brosh signed the complaint charging Carrie Hollander with a bigamous marriage under *N. J. S.* 2A:92–1, asserting December 26, 1960 as the date of marriage — the date that Carrie Hollander allegedly slipped in front of Rigoletti's tavern—and Wayne the place of the marriage. Mrs. Schmidt had no knowledge of the Hollander accident.

The Cohn firm was informed on May 29, 1962 that the complaint was scheduled for hearing on June 6, 1962. Cohn sent a letter to Marie Rigoletti dated May 31, 1962 advising her that the complaint had been filed and adding:

"If you desire that we be present, it will be necessary that you send us a check in the sum of $100.00 covering our appearance."

Elwyn Saviet, an associate with the Cohn firm, appeared in court on June 6. He testified before the Committee that he had been called into Cohn's office early that morning and given instructions to take the Carrie Hollander deposition to the Wayne Municipal Court. He claimed he was not told the name of the case nor the nature of the complaint. Cohn testified that he gave the transcript to Saviet and identified the matter as "State v. Hollander in Wayne" but had no further discussion on the matter. Saviet also said that Cohn told him to "look at the records at Wayne" for something "to help give me a complete picture." Upon reaching the court Saviet stated that he was told by Brosh that the complaint involved Mrs. Hollander's marital status.

The transcript of the hearing in the municipal court shows Elwyn Saviet as appearing, but it does not show for whom he appeared. Brosh acknowledged at the hearing that he read and filed the complaint but was unable to testify in support of any of its elements or allegations. The magistrate testified that Saviet actively participated in the proceedings. At the

municipal court hearing Saviet said, "I was informed by the Prosecutor that there was no record of the marriage on the date charged in Wayne. All the information that I have at my disposal, which is from the depositions, does not support the charge either * * *." The Assistant Prosecutor consented to a dismissal and the court dismissed the complaint. Saviet then attempted to have the case adjourned on the ground that he did not have sufficient knowledge of the facts. Saviet further testified that he returned to the office and told Cohn "that the complaint had been dismissed by the court because of the fact that there were no records to support and that there was no proof to support it in the depositions." He said that the records showed no marriage in Wayne in 1960.

Cohn denied that he participated to any extent in either the filing of the complaint or the trial before the magistrate. His explanation of his letter of May 31, 1962 is that the $100 was not a legal fee but rather for messenger service for delivery of the transcript of the deposition to the court and that he hoped the size of the charge would dissuade her from proceeding with the bigamy charge. But the fact is that he accepted the $100 after the hearing.

Although as noted above, there is considerable conflict in the oral testimony of Cohn and Rigoletti, the testimony of the clerk and deputy clerk of the Wayne Municipal Court and the letters of Cohn, particularly the letter of May 21, 1962, together with the appearance of Saviet at the hearing, leave no doubt that he at least participated and assisted Rigoletti in the preparation, processing and trial of the charge of bigamy. His denials under the circumstances are unbelievable. There is as well no doubt that the purpose thereof was to influence Carrie Hollander to discontinue her suit. We find Albert Cohn guilty as charged in Count I.

## II.

In the second count Albert Cohn is charged with violation of *Canon* 6 in that he "accepted a retainer agreement

from a client who was to be the chief witness in another pending matter against another client he already represented."

The facts as elicited at the Passaic County Ethics Committee hearing are as follows:

On April 30, 1961 Vincent Bologna, who was 19 years of age, bought a total of nine containers of beer at Rigoletti's tavern, Mountain View Inn. The purchases, although made on the same evening, were made at different times. The beer was consumed by Vincent, his brother Jack and several others in a car owned by John Etzel and driven by a friend of Bologna's named Novack. Vincent and his brother were thereafter injured when the car, traveling at 80 M.P.H., failed to make a turn and hit a tree. He testified that the driver, Novack, was drunk. Vincent's injuries were slight but his brother Jack had "both ligaments in his legs broken or torn, or something."

Rigoletti was thereafter charged by the Township of Wayne in a proceeding for the revocation of her liquor license, with three separate counts of selling alcoholic beverages to a minor, Vincent. She retained the Cohn firm to represent her in connection with these charges. Vincent was charged in the Wayne Municipal Court with the purchase of alcoholic beverages while a minor. He pleaded guilty on May 17, 1961 and paid a fine.

Cohn testified that Rigoletti asked him to investigate where the beer had been purchased, claiming that Bologna had not gotten it from her tavern, and that in furtherance thereof he sent Matthew Linda, an investigator employed by the Cohn firm, to the Wayne Municipal Court on the day of Vincent's hearing in order to get a statement from him as to where he had obtained the beer.

Linda contacted Vincent outside of the courtroom after the hearing. It is undisputed that it was then suggested that Cohn represent Vincent in a civil suit for injuries sustained in the accident. There is a controversy as to who made the suggestion. Vincent followed Linda to the Cohn office where Linda testified he took a statement concerning the purchase

of beer. While at the office that night Vincent also gave certain information to Linda concerning the accident of April 30, 1961. Linda inserted these facts into blank spaces on the front of a mimeographed typewritten page entitled "Statement of Accident and Retainer Agreement." At the top of the reverse side thereof the following appears:

"We *Vincent Bologna and Joseph V. Bologna* in consideration of services rendered to me or to be rendered in the matter between *Vincent and Joseph Bologna*, Plaintiffs, and *Lawrence Novack and John Etzel*, Defendant, agree to pay to David & Albert L. Cohn, Esqs. *50* Per cent-dollars out of the moneys realized in settlement of or from judgment obtained in said matter, and I hereby assign *50* per cent-dollars to them, all costs to be paid by me. I also agree to pay a retainer fee of $_____ in advance of the institution of suit, on account of filing, fees, court costs, investigation, discovery, or other expenses, credit for which is to be given upon final settlement and distribution.
(3) In the event of adverse result, no part of same is refundable.
WITNESS: *Vincent Bologna    L.S.*
*Joseph V. Bologna   L.S.*"

The above is printed except for the italicized words which were inserted in blank spaces. Linda testified that he inserted the figures "50" preceding the words "per cent." The balance of the back of the sheet was left blank for the insertion of further details of the accident. Cohn saw this document within a few days after May 17.

He testified that he first met with Joseph Bologna and his two sons, Vincent and Jack, on May 25, 1961 to discuss the claims against Novack, the driver of the car, at which time the retainer was signed by Vincent and Joseph. He testified that he then

"told the father and the two boys that we represented Mrs. Rigoletti and asked them whether or not they intended in any way to make claim against her. I told them that under the law they could make a potential claim against her, and said that if they wanted to do it, we could not represent them; we represented her.
Q. What did they answer in response to that statement?
A. I know one of the boys said he knew it, that we represented her, that he had been told that by Mr. Linda or somebody, that they wanted to make the claim only against the driver and owner of the car in

which they were passengers when this accident occurred * * *. I know that I told them that I would check with Mrs. Rigoletti first to see whether or not we could represent them, if she had any objection."

Daniel Crystal, a member of the Cohn firm, testified that he heard Cohn tell the Bolognas that the firm represented Rigoletti. Although Linda at first denied knowing that the Cohns represented Rigoletti at the time he spoke to Vincent, he later testified that he told Vincent on May 17 that the Cohn firm represented her.

The Bolognas testified that they were not then told that the Cohn firm represented Rigoletti. They further testified that they learned this fact only when Cohn appeared for Rigoletti at the revocation hearing of June 27, 1961 and that they then terminated their relationship with Cohn.

Cohn testified that he received Rigoletti's permission to represent the Bolognas. However, there is no correspondence to substantiate this claim. Rigoletti, on the other hand, testified that she did not know and was never told that the Cohns would represent the Bolognas.

Respondents put into evidence a letter dated June 29, 1961 written by Cohn to Joseph P. Bologna. Cohn quite patently sought by this communication to continue his representation of the Bolognas. They claimed that they had cancelled his employment on June 27, 1961 when they learned at the Rigoletti hearing that Cohn represented her. The second paragraph begins "As was explained to you" and then proceeds to relate the same information about the Cohn representation of Rigoletti as Cohn testified to having told the Bolognas in his office on May 25, 1961. It is to be noted that the letter is dated subsequent to June 27, 1961, when as above stated the Bolognas insisted they had cancelled Cohn's employment. The statement "As was explained to you" is of questionable weight since the letter could well have been written as a "cover-up" to justify Cohn's action to the Bolognas.

His dual representation placed him in a position where he could receive confidential information from each client which could be used to the advantage of the other. Clearly there

were conflicts of interest between the Bolognas and Rigoletti which, even if explained to them in advance, would make it almost impossible to adequately represent both parties in their respective proceedings. Furthermore, Cohn did not disclose to the Bolognas all the circumstances of his relations to Rigoletti and therefore could not obtain a knowledgable consent.

There is no evidence that Cohn told the Bolognas that he would have to cross-examine Vincent at the revocation hearing in order to try to break down his story that the beer was purchased at the Mountain View Inn and prove that he either lied or at best was mistaken in that respect. This he would have to do in order to discharge his duty to Rigoletti in pressing her defense that the purchase was made elsewhere. Nor does the record disclose any advice to the Bolognas of the extent of a possible recovery against Rigoletti.

But over and above the conflict of private interests of his clients, his conduct in seeking to represent the State's principal witness in the revocation proceeding was a breach of *Canon* 29 which provides in part:

"He should strive at all times to uphold the honor and to maintain the dignity of the profession and to improve not only the law but the administration of justice."

Vincent Bologna was the principal State witness in the revocation proceeding in which Cohn was counsel for Rigoletti. In accepting Vincent as a client there arose a conflict between his duty to Rigoletti and the State. Not only is it unethical for counsel to improperly influence a witness in his testimony but it is as well improper for him to place himself in a position where he could influence a witness in a manner to color his testimony favorable to his client. Here the crucial question was whether Vincent had purchased beer at the Mountain View Inn — a fact which Cohn's client Rigoletti denied. By accepting Vincent as a client before the trial of the revocation proceeding, Cohn placed himself in a position where he could establish a rapport with Vincent which could result in an

effect inimicable to the State. This could be accomplished by a reduction in the fee, a promise of a greater recovery, advice as to the adverse effect upon Vincent's suit of testimony that the beer was purchased at the Mountain View Inn, or in a number of other subtle means. It is of no moment that actual promises were not articulated by Cohn or that he did not expressly seek to have Vincent change his testimony. It is sufficient that the representation of Vincent gave rise to a latent opportunity to so influence a State witness by oral importuning or silent conduct to brand the dual representation an ethical breach. The situation is fraught with inherent dangers to the proper administration of justice and is against the public interest. Further, and perhaps even more importantly, the impact on the public of Cohn's representation of both the State's principal witness and the defendant in the revocation hearing would not be conducive to respect for law, order, and the judicial process. Public knowledge of those relationships could and probably would engender, at the least, a serious doubt about the integrity of the proceeding. Cohn's conduct in accepting Vincent as a client reveals a basic misconception of ethical standards. We find Albert Cohn guilty as charged in Count II.

### III.

In the third count Albert Cohn is charged with violation of "Canons 27 and 28 by soliciting professional employment through a touter, and stirring up litigation by volunteering advice to bring a lawsuit." The testimony of Linda, the Cohn investigator, that this was the only case he had processed and that the Cohns had expressly directed him to have no part in obtaining clients for the firm stands uncontradicted. The evidence is not clear and convincing that Cohn is guilty as charged in the third count. We therefore find him not guilty. *In re Pennica*, 36 *N. J.* 401 (1962).

However, the factual foundation of this charge, including the Retainer Agreement, gives rise to some comment for future guidance of the bar.

In the first place, when an attorney obtains a case through a layman employee he should most carefully scrutinize the facts and circumstances which led up to his being retained. He should take a second look in order to assure himself that his employee is not guilty of "ambulance chasing, touting or running." It is self-evident that there is a special danger that an employee might be guilty of such conduct, whether actuated by the hope or promise of direct financial compensation or by a desire to curry favor with his employer. It is redundant but perhaps warrants repetition that if there is the slightest doubt that the client was thus obtained, a lawyer should refuse to accept his representation.

█ Second, the amount of the fee, as inserted in the Retainer Agreement, raises serious ethical problems. It must be remembered that the Committee properly preferred no charges grounded on the size thereof, because the testimony of the Cohns, that Linda, who inserted the figure, had no authority to so do, and that the Cohns never charged a contingent fee of more than 33-1/3% stands undenied. Our silence should not be thought to approve a 50% arrangement. Except in a case involving a small sum a contingent fee approaching that size, even after deduction of expenses, and even after trial, would plainly be excessive.

## IV.

The balance of the charges against Albert Cohn in the fourth count are so intertwined with the above three that it is unnecessary to specially treat of them.

█ Insofar as David Cohn is concerned, the single charge which is made in part three of the fourth count concerns business cards given to the investigator Linda. We are advised that this was not an unusual practice among the bar, but that it has been discontinued by the Cohns since the New Jersey Supreme Court Advisory Committee on Professional Ethics filed its opinion No. 9, 86 *N. J. L. J.* 617 (1962). We therefore find him not guilty.

After a consideration of all the circumstances we are of the opinion that Albert Cohn should be suspended from the practice of law for one year and until the further order of this Court.

It is so ordered.

*For suspension of Albert L. Cohn for one year*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.