IN THE MATTER OF HAROLD I. GARBER, AN ATTORNEY
AT LAW.

Argued September 13, 1983—Decided March 28, 1984.

*Robyn M. Hill* argued the cause for complainant Disciplinary Review Board (*Colette A. Coolbaugh,* Secretary, attorney).

*Vincent L. Lamanna, Jr.,* argued the cause for respondent.

The opinion of the Court was delivered by

HANDLER, J.

Respondent, Harold I. Garber, represented the sole eyewitness to a murder, whose account of the crime had resulted in an indictment for murder against Philip Leonetti. Later, the witness, with the advice of respondent, recanted his identification of Leonetti as the murderer, leading to the dismissal of the indictment. The circumstances surrounding these events gave rise to a presentment against respondent filed by the District I Ethics Committee (Committee). Following hearings, the Committee determined that respondent had engaged in conduct prejudicial to the administration of justice in violation of *DR* 1–102(A)(5), and further, had accepted employment in the face

of personal interests that could impair his independent professional judgment, contrary to *DR* 5–101(A).

The Disciplinary Review Board (DRB) declined to accept this determination of the Committee. Nonetheless, it concluded "that the respondent's conduct resulted in a definite appearance of impropriety, and, in so doing, constituted misconduct which adversely reflects on his fitness to practice law. *DR* 1–102(A)(6)." The DRB recommended that respondent be publicly reprimanded. Two members of the DRB dissented, concluding that the respondent had not engaged in unethical conduct.

This Court issued an Order to Show Cause why respondent should not be disbarred or otherwise disciplined. In the exercise of our jurisdiction in disciplinary matters we now modify the decision of the DRB. The conduct of respondent constituted ethical infractions in violation of *DR* 1–102(A)(6), as found by the DRB, and of *DR* 1–102(A)(5) and *DR* 5–101(A), as found by the Committee. Further, respondent violated *DR* 5–105(A), for not "refusing to accept or continue employment if the interests of another client may impair the independent professional judgment of the lawyer."

I

We have engaged in an independent examination of the record and conclude that the findings of fact set forth in the decision of the DRB were clearly and convincingly established by the evidence presented at the hearings in this matter. These facts demonstrate that a "gangland style" murder of an individual named Guiseppi (Pepe) Leva had occurred outside Price's Pit, an Atlantic County landfill, in the summer of 1977. Earl Wayne DeVault, a sanitation truck driver, was the only known witness. The Atlantic County Prosecutor's Office apparently did not realize the existence of this witness until nearly one year after the murder, when the file was again reviewed. DeVault was then questioned and he identified Philip Leonetti as the murderer. Leonetti was subsequently indicted for the murder.

Police protection was assigned to DeVault upon the issuance of the indictment.

Leonetti was arrested on August 25, 1978, and his picture appeared in the Atlantic City Press the following day, accompanied by an article that described him as "an alleged associate of organized crime figures." On August 26 or 27, DeVault advised two detectives from the Atlantic County Prosecutor's Office that the picture of Leonetti in the paper did not look like the person he saw at the murder scene. However, despite his qualms concerning the newspaper photograph, DeVault confirmed his prior identification of Leonetti to the detectives. In light of this confirmation, as well as a subsequent confirmation during an interview between DeVault and the assistant prosecutor in charge of the case, DeVault's confusion over the newspaper photograph was not regarded by the prosecutor as significant.

DeVault thereafter discussed with his employer, Seymour Renshon, his concern that the man pictured in the newspaper was not the individual he saw at Price's Pit on the day of the murder. Renshon then spoke with his paramour, who was a close friend of respondent. She in turn contacted respondent and requested that he do her "a favor and help out a friend of hers." Following this conversation, Renshon telephoned respondent.

The purpose of Renshon's call obviously related to DeVault's critical status as the sole identification witness in the Leonetti murder prosecution. This can be readily inferred from the elaborate plans made for a meeting between respondent and DeVault. The meeting was scheduled for that same afternoon, on August 30, 1978, at the Azzi Insurance Agency, rather than the respondent's law office; further, respondent's secretary and an associate were instructed to attend the meeting and to bring a typewriter, a tape recorder and a camera. DeVault was also instructed to ask for a Mr. Sausto when he arrived at the

insurance office so that the police officers assigned to protect DeVault would not realize that he was meeting with respondent.

The meeting took place according to plan. DeVault advised these police officers that he was going into the insurance office to pay a bill. Once DeVault was in the insurance office without his police guard, respondent tape recorded a statement wherein DeVault recanted his prior identification of Leonetti. Respondent then had DeVault sign a statement indicating that he was not coerced into making the tape recording or signing the statement. This statement was witnessed by respondent, his associate and his secretary.

"Several days later," according to the DRB decision, "respondent turned the tape recording over to his friend and client, Nicodemo Scarfo, who is [Leonetti's] uncle and reputed to be a highly placed organized crime figure." Respondent claimed that the reason he took the tape to Scarfo instead of Leonetti's attorney was that there had been a substitution of defense counsel and he "did not want to burden [the original defense attorney] by asking him the name of substituted counsel." However, the DRB concluded that respondent was aware of the identity of the substituted counsel because the substitution was "a matter of public record."

Respondent had no further contact with his client DeVault for approximately two and one-half months following the August 30 meeting. Nevertheless, during this time respondent attended several pretrial hearings in Leonetti's murder case, where he was seen with the defendant Leonetti. He also received from Scarfo discovery materials in the case. Further, although respondent claimed that he intended to provide a copy of the tape to both the defense counsel and the prosecutor, the tape was not delivered to defense counsel until November 8, 1978. The prosecutor did not obtain the tape until November 16 or 17, 1978.

After the delivery of the taped recantation, respondent arranged with Renshon for another meeting with DeVault. This

took place on Sunday, November 19, 1978, at the premises of Renshon's company, ABC Refuse, where DeVault worked. Although respondent had neither seen nor conferred with his client DeVault since their single meeting the previous August, in a matter of just a few minutes DeVault signed the following handwritten statement:

To whom it may concern:

Mr. Garber has been my attorney since Aug/78

I approve of his giving the tape in question to both parties.

I want him to represent me in the Leonetti matter

I do not wish to speak to anyone about this matter without Mr. Garber present.

            S/Earl DeVault
            S/Seymour Renshon
S/Harold Garber
I do not want
future police protection
            S/Earl DeVault
            S/Seymour Renshon
S/Harold Garber

Promptly upon obtaining DeVault's signed statement, respondent telephoned the judge assigned to pretrial hearings in the murder prosecution. Respondent advised the judge that he represented DeVault, and that he was being kept from his client by the Prosecutor's Office. The judge then determined to review the matter on the following morning, November 20, 1978.

The ensuing events were chronicled by the DRB:

Within an hour of respondent's conversation with Judge Neustadter, and within an hour and a half of his abbreviated meeting with his client, the respondent was seen exiting a bar in Atlantic City with Scarfo, entering Scarfo's car and driving away with him. Later that evening, Scarfo and the respondent were again seen together at respondent's residence.

    *    *    *    *    *    *    *    *

At the November 20th hearing before Judge Neustadter, the issue of DeVault's representation by Garber was reviewed. Shortly thereafter, on or about November 21, 1978, the indictment against Leonetti was dismissed by the Court.

On November 21, respondent was again seen with Scarfo, driving to Philadelphia in Scarfo's car.

On November 27, 1978, within a week of the dismissal of the indictment, DeVault was required to testify before a grand jury

concerning his relationship with the respondent in the Leonetti matter. Respondent continued to represent DeVault in these proceedings. Several months later, on March 29, 1979, respondent again acted as DeVault's counsel in another grand jury proceeding convened to determine whether there was any criminal conduct in the contacting of DeVault, as well as whether any of the individuals who had testified before the prior grand jury in the *State v. Leonetti* investigation might have committed perjury. Between these two grand jury proceedings, the respondent represented Leonetti in a motor vehicle matter in Brigantine, New Jersey. This matter was heard in the Brigantine Municipal Court on February 6, 1979. When DeVault appeared before the second grand jury on March 29, 1979, he testified under oath that respondent had not advised him of this recent representation of Leonetti.

Respondent and DeVault did not meet thereafter until the Friday before DeVault's appearance before the Committee, in December 1980. That meeting was again arranged by the respondent and Renshon to take place at ABC Refuse. At the meeting respondent reminded DeVault of the "mistake" he had made in his testimony before the grand jury on March 29, 1979, referring to DeVault's sworn statement to the grand jury that respondent had not informed him of his legal representation of Leonetti in the Brigantine matter. DeVault testified accordingly on December 18, 1980, before the Committee that he had made a "mistake" in his grand jury testimony concerning respondent's failure to inform him of any ongoing legal representation of Leonetti.

## II

The evidence demonstrates clearly and convincingly that respondent was guilty of an actual conflict of interest. He placed himself in a professional relationship with DeVault, a key identification witness in the murder prosecution of Leonetti. The ostensible single purpose of that relationship was to furnish

legal advice to DeVault in connection with DeVault's asserted intention to recant his identification testimony inculpating Leonetti. At the same time, respondent continued to maintain a professional relationship with Leonetti. He also preserved a social relationship with Leonetti. His professional and personal relationships with Leonetti created an unbridgeable and irreconcilable conflict with the paramount professional duty he owed to his primary client, DeVault. In fostering this conflict of interest respondent violated both *DR* 5–105(A) and *DR* 5–101(A).

*DR* 5–105(A) bars a lawyer from continuing employment if his or her independent professional judgment will be or is likely to be adversely affected because of the interests of another client. *DR* 5–101(A) prohibits a lawyer from accepting employment when his or her own financial, business, property, or personal interests will or reasonably may affect his or her professional judgment on behalf of a client, unless after full disclosure the client consents.

The position of DeVault as the State's sole eyewitness of Leva's killer placed him in a direct adversarial relationship to Leonetti, the person whom he identified as the killer and who, as a result, was formally charged with the murder. DeVault's knowledge of the facts of the homicide made him a key witness and the primary, if not sole, source of evidence of Leonetti's guilt. Clearly, in that posture, the conflict between the legal interests of DeVault and Leonetti was acute. *See In re Cohn,* 46 *N.J.* 202 (1966).

After DeVault recanted this identification, his position shifted to one supportive of Leonetti's innocence. That circumstance, however, did not eliminate the conflict of interest between DeVault and Leonetti. DeVault's relationship to Leonetti was never neutral. While DeVault's recantation could exculpate Leonetti as Leva's murderer, such recantation testimony is inherently vulnerable. *E.g., State v. Carter,* 69 *N.J.* 420 (1976). Hence, if DeVault's recantation itself were challenged or retracted, he could still possibly inculpate Leonetti.

Respondent has attempted to minimize the conflict inherent in his representation of one in DeVault's role as a recanting witness by discounting his responsibilities as a lawyer for a client in DeVault's position. Nevertheless, it is clear that a recanting witness is confronted by enormous legal pitfalls and thus is particularly in need of careful, objective and sound legal advice. *Id.; see, e.g., State v. Carter,* 136 *N.J.Super.* 271 (Cty. Ct.1974), reh'g den. 136 *N.J.Super.* 596 (Cty.Ct.1975), rev'd, 69 *N.J.* 420 (1976). A recanting witness in DeVault's position could be exposed to charges of false swearing, *N.J.S.A.* 2A:131–4 (now *N.J.S.A.* 2C:28–2), or perjury, *N.J.S.A.* 2A:131–1 (now *N.J.S.A.* 2C:28–1). He could also in given circumstances be exposed to charges for the obstruction of justice, *N.J.S.A.* 2A:85–1 (repealed 1979), and conspiracy, *N.J.S.A.* 2A:98–1, 2 (now *N.J.S.A.* 2C:5–2). Further, such a person may be subject to pressures and threats from those who are aggrieved by his original statements. He also may be subject to considerable pressures from those ostensibly disadvantaged by his recantation or who might again find a benefit in the retraction of the recantation.

Despite a singular need to furnish scrupulous and untainted legal advice, respondent could not in the circumstances of this case give DeVault his complete and undivided loyalty. It is clear from the record that he continued a professional commitment to Leonetti while representing DeVault. As noted, respondent had served Leonetti as an attorney on two separate occasions prior to his August 30, 1978 meeting with DeVault. He again represented Leonetti on February 6, 1979, prior to DeVault's second grand jury appearance on March 29, 1979.

Respondent contends that there was no conflict attributable to any professional relationship with Leonetti. Respondent trivializes these instances of representation, claiming they were unimportant and unrelated to Leonetti's murder case. Respondent contends, further, that the last instance in which he represented Leonetti, in February 1979, occurred after the murder indictment had been dismissed, and, consequently, DeVault could suffer no prejudice. This is not true. Respondent knew

or had reason to know that the earlier dismissal of Leonetti's indictment did not end DeVault's need for counsel. As already pointed out, following the dismissal of the indictment, there were immediate grand jury proceedings that touched upon De-Vault's actions in the murder prosecution. Further, respondent had had a conversation with Renshon concerning possible criminal charges of perjury and false swearing that might be filed against DeVault. There is no evidence that respondent had been informed by any authority that the investigation of De-Vault's recantation and the circumstances leading to the abortion of the murder prosecution was formally terminated. In fact, only a few months after the initial grand jury proceeding, a second grand jury was convened and directed to investigate possible perjury charges in relation to the Leonetti murder case.

Despite the pendency of these serious unresolved legal problems affecting DeVault, and in the absence of any reasonable grounds for assuring that DeVault's legal problems had been satisfactorily concluded, respondent undertook to represent Leonetti in February. This clearly compromised the professional obligation and loyalty that he still owed DeVault. Thereafter, respondent further compromised himself when he continued to act as DeVault's attorney before the grand jury. These crisscrossing representations of Leonetti and DeVault cannot be dismissed as a concatenation of coincidences. Rather, they evidence the calculated creation of an indefensible conflict of interest.

During this same period, respondent was observed in Leonetti's presence at pretrial hearings in conjunction with the prosecution of Leonetti's murder case. This generated the impression that respondent was associated with or interested in Leonetti's defense. See In re Hinds, 90 N.J. 604 (1982). It also created a strong inference that the professional relationship between respondent and Leonetti was continuing and unbroken, which is reinforced by additional circumstantial evidence. Respondent acknowledged his intimacy with Leonetti; he enjoyed a continuing friendship and personal relationship with Leonetti, with

whom he concededly socialized on at least one occasion before the murder indictment was dismissed. Further, respondent had employed Leonetti as a bartender at Harold's Haunted House, an establishment owned by respondent.

In addition, as is indisputably clear from the record, respondent maintained a close friendship with Leonetti's uncle, Nicodemo Scarfo, an intimate of Leonetti as well. Leonetti apparently resided with Scarfo during this time, and also acted as his business associate at Scarfo, Inc., a business of Scarfo. Leonetti was in Scarfo's company frequently—most notably when he was arrested for the murder of Leva on August 25, 1978. In context, this is highly significant because Scarfo himself was personally and deeply involved in his nephew Leonetti's case. It is evident that respondent shared Scarfo's interest and involvement in Leonetti's case. As noted, respondent attended several court proceedings involving the Leonetti prosecution. Further, respondent delivered the crucial taped recantation of DeVault to Scarfo instead of to Leonetti's counsel, the Atlantic County prosecutor or the judge assigned to the case. Scarfo also gave the Leonetti murder prosecution discovery materials to respondent. Later Scarfo accompanied Leonetti and respondent in the subsequent Brigantine municipal court hearing prior to DeVault's testimony in March 1979 before the grand jury. Moreover, respondent did not charge DeVault for his legal services, explaining that he performed these services for "my fun, my hobby," as well as a favor to Renshon's paramour, described by respondent himself as a "dear friend of Scarfo and dear friend of mine." The conclusion is irresistible that as a consequence of respondent's continuous personal association with Scarfo, respondent also was deeply involved with Leonetti.

It is patently unethical for a lawyer in a legal proceeding to represent an individual whose interests are adverse to another party whom the lawyer represents in other matters, even if the two representations are not related. *Gray v. Commercial Union Ins., Co.,* 191 *N.J.Super.* 590, 598 (App.Div.1983);

see *International Business Machines Corp. v. Levin,* 579 *F.*2d 271 (3d Cir.1978). A lawyer may not represent the adversary of one of his present clients. *Gray v. Commercial Union Ins. Co., supra,* 191 *N.J.Super.* 590; *see In re Cipriano,* 68 *N.J.* 398 (1975).

In *In re Cohn, supra,* 46 *N.J.* 202, respondent accepted a retainer to represent an individual who also was to be the chief witness for the State in a pending administrative proceeding against another client respondent was already representing. We recognized the inherent actual conflict of interest in that kind of setting.

> Not only is it unethical for counsel to improperly influence a witness in his testimony but it is as well improper for him to place himself in a position where he could influence a witness in a manner to color his testimony favorable to his client. Here the crucial question was whether Vincent had purchased beer at the Mountain View Inn—a fact which Cohn's client Rigoletti denied. By accepting Vincent as a client before the trial of the revocation proceeding, Cohn placed himself in a position where he could establish a rapport with Vincent which could result in an effect inimicable [*sic*] to the State. This could be accomplished by a reduction in the fee, a promise of a greater recovery, advice as to the adverse effect upon Vincent's suit of testimony that the beer was purchased at the Mountain View Inn, or in a number of other subtle means. [*Id.* at 212–13.]

Likewise here, respondent created the opportunity, whether or not actually exploited, of influencing DeVault in a manner favorable to Leonetti, his erstwhile and sometime client. The potential for this clearly could have a deleterious effect, not only upon DeVault, but also upon the State, which had an overriding interest in the just disposition of the Leva murder case. This conflict of interest generated the strong potential that respondent would be "less than a vigorous partisan" in his legal representation of DeVault. *See State v. Bellucci,* 81 *N.J.* 531, 541 (1980). Under no circumstances and by no stretch of the imagination could an attorney with any propriety ever represent an eyewitness or a material witness to a crime and also represent, or become professionally associated with, the individual charged with the commission of such a crime. *See State v. Land,* 73 *N.J.* 24 (1977). In consequence, because respondent's ongoing professional relationship with Leonetti co-

incided in time with his specific representation of DeVault as the key material witness relating to the murder prosecution against Leonetti, the existence of an actual conflict is patent and inescapable. It constitutes a clear violation of *DR* 5–105(A).

We also determine that respondent has violated *DR* 5–101(A), which prohibits a lawyer from representing a client when his personal interests may reasonably affect his independent professional judgment. Respondent's close friendships with Leonetti and Scarfo constitute a "personal interest" that clearly could detrimentally affect his professional judgment on behalf of DeVault. *See Perillo v. Advisory Comm. on Professional Ethics,* 83 *N.J.* 366, 375 (1980). Indeed, these personal ties were so close that respondent claimed to be able to assure "safe passage" to DeVault, implying that, because of his connections to Leonetti and Scarfo, he was DeVault's only possible source of aid. Presumably, this refers to some kind of threatened harm that might befall DeVault if his metamorphosis into a fully recanting witness was incomplete or too slow.

It would be sophomoric to believe that in these circumstances respondent would be zealous and single-minded in his representation of DeVault. *See Perillo, supra,* 83 *N.J.* at 375. This conduct, representing DeVault in the face of his strong personal interest in Leonetti, also equates with an actual conflict of interest. It constitutes a clear violation of both *DR* 5–101(A) and *DR* 5–105(A).

## III

■ The creation of a professional conflict of interest is an ethical impropriety. In appropriate circumstances, an attorney's creation of the appearance of conflict alone is sufficient to constitute an ethical violation.

We have frequently adverted to the principle that an attorney should avoid even the appearance of impropriety which may arise when he acts as an adversary against a former or existing client. *In re Cipriano,* 68 *N.J.* 398 (1975). *Cf. DR* 9–101 (lawyer should avoid even the appearance of impropriety). "To maintain public confidence in the bar it is necessary that the appearance of, as well as

actual, wrongdoing be avoided." *In re Cipriano,* 68 *N.J.* at 403. In *State v. Rizzo,* 69 *N.J.* 28, 30 (1975), we referred to the principle in this language:

However, a lawyer must avoid even the appearance of impropriety, DR 9–101, to the end that the image of disinterested justice is not impoverished or tainted. Thus it is that sometimes an attorney, guiltless in any actual sense, nevertheless is required to stand aside for the sake of public confidence in the probity of the administration of justice.

See also *Higgins v. Advisory Committee on Professional Ethics,* 73 *N.J.* 123 (1977); *State v. Galati,* 64 *N.J.* 572, 576 (1974). [*In re Opinion No. 415,* 81 *N.J.* 318, 323 (1979).]

*Accord Perillo, supra,* 83 *N.J.* at 373; *Reardon v. Marlayne, Inc.,* 83 *N.J.* 460, 472–73 (1980). "[E]ven if the attorney's devotion to his client was not in fact diminished, still the arrangement may suggest to others that it was. Appearances too are a matter of ethical concern, for the public has an interest in the repute of the legal profession." *In re Abrams,* 56 *N.J.* 271, 277 (1970). Thus, respondent's intertwined connections with the criminal defendant, Leonetti, and his uncle, Scarfo, coinciding with his representation of DeVault, presented an indelible appearance of impropriety that breaches ethical standards. This is so regardless of whether or not respondent's connections with Leonetti actually infected respondent's professional judgment with regard to DeVault. Indeed, this impression of impropriety is underscored by the acknowledged fact that DeVault was a peculiarly susceptible and impressionable individual, a person apparently easily influenced.

And should the public so believe, and thus suspect the outcome of the litigation proceeded from undue influence upon the policeman's testimony, and not from the merits, there is a sure result. The doubts thus engendered or suspicions aroused ("these fellows all stick together") impoverish the appearance of justice and taint the image of law and its even-handed enforcement. [*State v. Galati,* 64 *N.J.* 572, 576 (1974).]

The crux of respondent's ethical violation here does not turn on the wholly pragmatic or fortuitous outcome of legal events. Rather, the essence of the ethical transgression is the compromised and equivocal professional posture of the attorney. There flows from this an apparent sapping of moral integrity and clouding of intellectual focus, which ultimately undermine the attorney's ability to give unalloyed legal advice to his client.

Equally damaging is the attendant public perception that, as a consequence of respondent's compromised position, professional probity has been diluted and the administration of justice perverted.

This is emphasized in *In re Cohn, supra,* 46 *N.J.* at 212–13, where we stated:

> It is of no moment that actual promises were not articulated by Cohn or that he did not expressly seek to have Vincent change his testimony. It is sufficient that the representation of Vincent gave rise to a latent opportunity to so influence a State witness by oral importuning or silent conduct to brand the dual representation an ethical breach. *The situation is fraught with inherent dangers to the proper administration of justice and is against the public interest. Further, and perhaps even more importantly, the impact on the public* of Cohn's representation of both the State's principal witness and the defendant in the revocation hearing *would not be conducive to respect for law, order, and the judicial process. Public knowledge of those relationships could and probably would engender, at the least, a serious doubt about the integrity of the proceeding.* [*Id.* (emphasis added).]

It is evident in this case that respondent had both the opportunity and motivation to undermine the proper administration of justice. The appearance of the conflict of professional loyalty fostered by respondent's conduct is as destructive of the public interest as the actuality of that conflict. "[A] community without certainty in the true administration of justice is a community without justice." *In re Spitalnick,* 63 *N.J.* 429, 432 (1973).

We conclude, therefore, that in addition to clear violations of *DR* 5–105(A) and *DR* 5–101(A), predicated upon an actual conflict of interest, respondent also fostered the appearance of such a conflict. He was in this respect guilty of violations of *DR* 1–102(A)(5) by engaging in "conduct that is prejudicial to the administration of justice," and *DR* 1–102(A)(6) for "other conduct that adversely reflects on * * * fitness to practice law."

IV

Respondent contends in defense to all charges of ethical misconduct that his client DeVault had consented to his simultaneous representation of Leonetti and that such consent eradi-

cates the conflict of interest and overcomes any appearance of conflict or ethical impropriety. We disagree for two reasons. First, it is abundantly clear that DeVault was not sufficiently informed of respondent's professional and personal connections to Leonetti and their possible impact on his own legal counsel and thus did not give an effective consent to respondent's representation of him. Second, and more important, there are certain conflicts of interest created by a lawyer's multiple representation of different clients that cannot be cured through the clients' consent. No consent, regardless of how informed it might be, could in the circumstances of this case permit respondent to undertake DeVault's representation.

The multiple representations that would ordinarily constitute violations of *DR* 5–101(A) and *DR* 5–105(A) are permissible only under limited conditions. First, the lawyer must be able reasonably to believe that adequate representation for each of his clients is possible under all of the circumstances. Second, the lawyer is obligated to disclose to each client all of the facts surrounding his dual representation and the possible effect of such multiple representation upon the conflicting interests of each client. Finally, based upon such full information, each client must consent to the multiple representation. *See DR* 5–105(C).

The DRB found that "the record is inconclusive with regard to disclosure to DeVault regarding respondent's various relationships with Scarfo and Leonetti and his alleged consent to the representation in the face of those close relationships." Thus, the DRB declined to adopt the findings of the Committee that respondent's representation of DeVault violated *DR* 5–101(A). We reach a different conclusion based upon the facts that have been clearly and convincingly established in this record concerning the adequacy of client consent in this case.

In *In re Dolan,* 76 *N.J.* 1 (1978), involving multiple representation within the context of real estate transactions, the Court emphasized the importance of a genuine informed consent. In stressing the totality of an attorney's loyalty to his client, the

Court stated that "if any conflicting interest could arise which would stand in the way of that kind of unstinting zeal, then the client must be so informed and the attorney may continue his limited representation only with the client's informed consent." *Id.* at 9. The requirement for fully informed consent is singularly applicable in the criminal field. In *State v. Bellucci, supra,* 81 *N.J.* at 544, involving the representation by the same or associated counsel of more than one defendant in a criminal prosecution, we emphasized that "both the attorney and the trial court must explain the possible consequences of joint representation to each defendant."

It is uncontested that respondent *never* disclosed to DeVault his previous representation of Leonetti during the first two and one-half months that he handled DeVault's recantation. A disclosure of this prior representation occured only on November 20, 1978, thirty minutes before the *in camera* proceedings before Judge Neustadter. This clearly was the kind of eleventh hour disclosure deplored by the Court in *In re Dolan, supra,* 76 *N.J.* at 11. Further, respondent's representation of Leonetti in February 1979 was allegedly disclosed to DeVault immediately preceding DeVault's appearance before the grand jury. However, this disclosure was similarly made at the last minute under circumstances that precluded any deliberative choice by DeVault.

Respondent also had an obligation to reveal fully to DeVault his personal relationships with both Leonetti and Scarfo. Respondent's asserted disclosure to DeVault at their first meeting on August 30, 1978 of these friendships was clearly inadequate. Respondent simply told DeVault of the association, without any information concerning the extent of these friendships, or of the possible ensuing legal and personal dilemmas they potentially posed for DeVault. Thus, we are completely satisfied that respondent undertook to represent DeVault in the face of a sharp conflict of interest, without his client's informed and knowledgeable consent.

However, of greater significance is the fact that any such consent by DeVault was immaterial and ineffective. There are

certain conflicts that are so egregious that they cannot be cured by consent. "[I]t is not professionally advisable for the inquirer to represent the same client both as advocate and adversary even if the cases are unrelated, and even if there are full disclosure and full consent." Advisory Committee on Professional Ethics Op. 301, 98 *N.J.L.J.* 209, 219 (1975). In the context of the criminal proceedings in this case in which respondent acted as DeVault's attorney, the interests that are implicated transcend those of the immediate parties or their attorneys. The public itself has the greatest stake in the propriety of the legal relationships that are created to properly administer criminal justice.

> [Consent] is [not] relevant when the subject matter is crime and when the public interest in the disclosure of criminal activities might thereby be hindered. It is inherently wrong to represent both the employer and the employee if the employee's interest may, and the public interest will, be advanced by the employee's disclosure of his employer's criminal conduct. [*In re Abrams, supra,* 56 *N.J.* at 276.]
>
> And this duality of sympathy and resulting conflict are unaffected by the consent of PBA and its accused member to such representation. As Justice Hall said in *Ahto v. Weaver,* 39 *N.J.* 418, 431 (1963), "Where the public interest is involved, he may not represent conflicting interests even with the consent of all concerned." *Cf.* C.J. Weintraub, "Notice to the Bar", 86 *N.J.L.J.* 713 (1963). [*State v. Galati, supra,* 64 *N.J.* at 578.]

Clearly, the public interest in the administration of criminal justice in the circumstances of this case compelled the unbiased and unstinted representation of DeVault. The subject matter of respondent's professional commitment involved the highly sensitive recantation of DeVault's crucial identification of an individual charged with murder. DeVault's consent to respondent's dual representation and divided loyalty in this context, even assuming its factual adequacy, is legally ineffective. We are convinced that respondent's ethical violations are not excused in any sense by the asserted consent of his client.

## V

In determining the appropriate sanction, "[t]he severity of discipline to be imposed must comport with the seriousness of

the ethical infractions in light of all the relevant circumstances."
*In re Nigohosian,* 88 *N.J.* 308, 315 (1982). Occasionally, this
Court has modified or rejected sanctions otherwise justified
because of special mitigating circumstances. *State v. Galati,
supra,* 64 *N.J.* at 578.

The matter before us, however, lacks significant mitigating
circumstances. Respondent insisted on representing DeVault
despite serious multiple conflicts of interest that were never
adequately disclosed or discussed with DeVault. *See In re Cohn,
supra,* 46 *N.J.* 202. His judgment in this matter was not warped
by an overwhelming concern for persons closely related to him
(*In re Hughes,* 90 *N.J.* 32, 41 (1982) (Schreiber, J., dissenting)).
Respondent is not redeemed by an exemplary record of past
service to the public (*In re Sears,* 71 *N.J.* 175, 202 (1976)), nor
can he be indulged because of a history of severe chronic
illnesses (*In re Thompson,* 67 *N.J.* 26, 34 (1975)). He offers no
excuse founded on any loss of competence or will (*In re Jacob,*
95 *N.J.* 132 (1984)). Further, respondent was not a victim of his
own inexperience or naivete (*In re Blatt,* 42 *N.J.* 522, 524 (1964)).
The likelihood of respondent engaging in similar activities in the
future based on an evaluation of his character can also affect
the appropriate measure of discipline. *In re Sears, supra,* 71
*N.J.* at 200. Here, respondent has exhibited no contrition or
even acknowledgment of any wrongdoing (*In re Rosenthal,* 90
*N.J.* 12, 17 (1982)), leaving no assurance that he would not
repeat his transgressions.

In contrast, we find in this case aggravating circumstances
that weight the degree of punishment. The case involves a
matter that implicates the most important public interest in the
justice system—the prosecution of crime. For all members of
the profession, the administration of criminal justice invokes a
high moral sensitivity and impells a strict adherence to ethical
standards. *See In re Rachmiel,* 90 *N.J.* 646 (1982); *In re Hinds,
supra,* 90 *N.J.* 604. Respondent was an experienced attorney,
thoroughly versed in the criminal practice. By his own testimo-

ny, respondent knew exactly what he was doing and appreciated fully all of the ramifications of his dual representations.

Added to the mix in this case is respondent's personal involvement with an individual reputed to be connected with organized crime. As noted, respondent's close friend, Scarfo, was Leonetti's uncle and involved actively in the proceedings regarding the murder prosecution of Leonetti. Scarfo's reputed connection with organized crime has no direct bearing on whether respondent committed any ethical violation as a substantive matter. However, this circumstance does have relevance and probative weight as an aggravating factor that bears on the extent of punishment. *Cf. N.J.S.A.* 2C:43–12 e(13) (directs that "[p]rosecutors and program directors shall consider in formulating their recommendation of an applicant's participation in a supervisory treatment program * * * [a]ny involvement of the applicant with organized crime"); *State v. Smith,* 92 *N.J.* 143 (1983) (gambling activities charged comprised legitimate basis of rejection of defendant's admission to PTI predicated on consideration of the factor of "[a]ny involvement of the applicant with organized crime" (*N.J.S.A.* 2C:43–12 e(13)) independent of the weight of evidence of guilt when Program Director found no other compelling reasons to justify admission). It bolsters the conclusion that respondent's course of action was calculated and contrived, not artless or inadvertent; his legal tactics reflected a cunning far different from the normal and necessary professional skills needed to properly represent a recanting witness. It is obvious that in wending his way to the legal ends he sought, respondent drew upon a considerable familiarity with the inner workings of the criminal justice system. The circumstances of respondent's intimacy with Scarfo and Leonetti, coupled with Scarfo's asserted connections to organized crime, destroy any possibility that respondent did not recognize and understand fully the ethical gravity of his conduct.

In the context in which respondent's ethical violations occurred, discipline harsher than a public reprimand is fully warranted. We accordingly suspend respondent from the practice

of law for a period of one year. Further, administrative costs, including the cost of a transcript shall be assessed against respondent.

*For suspension—*

Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*Opposed*—None.

## ORDER

It is ORDERED that HAROLD I. GARBER of ATLANTIC CITY be suspended from the practice of law for a period of one year and until the further order of this Court, effective April 16, 1984; and it is further

ORDERED that HAROLD I. GARBER reimburse the Office of Attorney Ethics for appropriate administrative costs, including the production of transcripts; and it is further

ORDERED that HAROLD I. GARBER be and hereby is restrained and enjoined from the practice of law during the period of his suspension; and it is further

ORDERED that HAROLD I. GARBER comply with Administrative Guideline No. 23 of the Office of Attorney Ethics regarding suspended, disbarred or resigned attorneys.