653 A.2d 909

ATTORNEY GRIEVANCE COMMISSION

v.

Michael Gayhart KENT.

Misc. (Subtitle BV), No. 48, Sept. Term, 1993.

Court of Appeals of Maryland.

Feb. 10, 1995.

Melvin Hirshman, Bar Counsel, and James P. Botluk, Asst. Bar Counsel, for the Atty. Grievance Com'n of Maryland, for petitioner.

Edward Smith, Jr., Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RAKER, Judge.

In this disciplinary proceeding, the Attorney Grievance Commission, acting through Bar Counsel, charged the respondent, Michael Gayhart Kent, with violations of Rule 1.7 (Conflict of Interest: General Rule), Rule 3.3 (Candor Toward the Tribunal), Rule 3.4 (Fairness to Opposing Party and Counsel), Rule 4.2 (Communication with Person Represented by Counsel), and Rule 8.4 (Misconduct) of the Maryland Rules of Professional Conduct. These charges stem from respondent's representation of Paul Holland and Anthony Gray, defendants in a first degree murder, robbery, and rape case in Calvert County, Maryland. Bar Counsel recommends that respondent be disbarred from the practice of law.

Pursuant to Maryland Rule BV9(b), we referred this matter to Judge Robert J. Woods of the Circuit Court for Calvert County, to make findings of facts and conclusions of law in accordance with Maryland Rule BV11(a). After a three-day evidentiary hearing, Judge Woods found that respondent had violated Rules 1.7, 3.4(c), 4.2, and 8.4(d), but that he had not violated Rule 3.3(a). Both Bar Counsel and respondent filed exceptions to the findings.

I.

Following the evidentiary hearing held on April 11–13, 1994, Judge Woods found the following uncontested facts:

"The Respondent, Michael G. Kent, was born in Calvert County, Maryland. He was admitted to the Bar of this Court on June 26, 1985. Upon graduation from law school, Respondent worked for Baltimore City State's Attorneys Office until 1987. In 1987, he came to work for a short time with the State's Attorneys Office in Prince George's County. He then opened up his own office in Calvert County, Maryland, at 3720 Solomons Island Road, Huntington, Ma-

ryland 20639. His intentions were to come back home where his family and friends were and to help the minority population in Calvert County. Around 1988 he joined the Federal Public Defenders panel. He initially practiced in Calvert County and Baltimore City. As his work progressed in Calvert County, he took less work from Baltimore City.

"On May 13, 1991, Linda Mae Pellicano was robbed, raped, and murdered in her home in Calvert County, Maryland. The initial investigation of the crime by the authorities revealed that a suspect in the murder was allegedly a caucasian male. Subsequently, the police circulated a composite photograph of the suspect in the local newspaper of Calvert County, from May 1991 until the first week of June 1991.

"Mr. Anthony Gray later made statements to the police which implicated himself and Mr. Paul Holland and Mr. Leonard Long. Mr. Gray, Mr. Holland, and Mr. Long were subsequently charged with having committed these crimes.

"In August 1991, Respondent was contacted by Mr. Holland and Mr. Holland's father to represent him. Beginning in August 1991, Mr. Gray was represented by Ms. Cristina Gutierrez.

"Ms. Gutierrez entered into plea negotiations with the State's Attorney, Warren Sengstack, which resulted in an agreement that Mr. Gray would plead guilty to first degree murder and first degree rape, and that he would testify against Mr. Long and Mr. Holland. Because of a lack of physical evidence connecting the Defendants to the crime, Mr. Gray's testimony was essential to the State's case against Long and Holland. On October 7, 1991, Mr. Gray entered a guilty plea pursuant to the plea agreement. Ms. Gutierrez intended to file a motion for reconsideration of Mr. Gray's sentence after Mr. Gray's promised testimony in the cases against Holland and Long. Although the State made no promises with regard to the sentencing of Mr. Gray, it was understood that if Mr. Gray testified as prom-

ised, the State would not oppose a reduction of sentence from life to a life sentence with all but 30 years suspended.

"On October 24, 1991, Respondent visited and spoke to Mr. Gray without the permission of his attorney, Ms. Gutierrez. Respondent also visited Mr. Gray twice on October 31, 1991 and once on December 7, 1991, all while Mr. Gray was represented by Ms. Gutierrez (Petitioner's exhibits 9 & 10). On October 31, 1991, Mr. Gray wrote a letter to Judge Rymer which stated:

> Mike Kent told me what the everydine [sic] was my case. My law never told me told thank. I'm not guset [sic] I was never at that lady house. I want to parte not gus [sic]. I want a new law. (Petitioner's exhibit 7).

"Respondent testified that it was he who gave Mr. Gray the paper to write the letter. Respondent also delivered Mr. Gray's letter to the Court on October 31, 1991. Mr. Gray sent a second letter to Judge Rymer on November 25, 1991, again denying criminal responsibility (Petitioner's exhibit 8). Respondent also had several conversations with Mr. Gray by telephone during the time Ms. Gutierrez was representing him.

"After Mr. Sengstack learned of Respondent's meeting with Mr. Gray, the State filed a Motion for Protective Order to prohibit Respondent from communicating with Mr. Gray. At the hearing on that motion held on November 18, 1991, Respondent testified that he had believed that Ms. Gutierrez no longer represented Mr. Gray (Petitioner's exhibit 11). Respondent also testified that he called Ms. Gutierrez's office and left a message prior to meeting with Mr. Gray (Petitioner's exhibit 11). Ms. Gutierrez states that Respondent never left a message for her prior to his meeting. Respondent's testimony is uncorroborated by any other source.

"After the Court entered the protective order, Respondent had at least one more conversation with Mr. Gray, on December 7, 1991, regarding the case, without the knowledge or permission of Ms. Gutierrez (Petitioner's exhibits 9 & 10).

"After his conversations with the Respondent, Mr. Gray refused to testify against Mr. Long and Mr. Holland. On December 16, 1993, Ms. Gutierrez withdrew her appearance per Mr. Gray discharged her and Mr. Gray retained Respondent to represent him in an attempt to withdraw his guilty plea. Mr. Kent entered his appearance on December 23, 1991. Respondent represented Mr. Gray from December 23, 1991 until January 20, 1992, while Respondent was still representing Mr. Gray's co-defendant, Mr. Holland. Respondent did not explain to Mr. Gray the conflict of interest inherent in the dual representation (April 12, 1994, Vol. III, pages 609–610).

"As a result of Mr. Gray's refusal to testify against his co-defendants, Mr. Long and Mr. Holland were acquitted of all charges. The Circuit Court denied Mr. Gray's motion to withdraw his guilty plea on February 21, 1992. On February 27, 1992, the Court imposed two life sentences, to be served concurrently.

"Respondent again entered his appearance for Mr. Gray on March 16, 1992, and filed an application for leave to appeal on behalf of Mr. Gray. That application for leave to appeal was denied by the Court of Special Appeals. Respondent never filed a motion to modify Mr. Gray's life sentence."

The hearing judge made additional factual findings, which we shall summarize. As a result of Gray's written and multiple oral statements that Holland had raped and stabbed Ms. Pellicano, there existed irreconcilable differences between Gray and Holland. The hearing judge further found that on October 28, 1991, Gray openly admitted his involvement in the Pellicano murder and gave no suggestions that he was not fully satisfied with his attorney, Ms. Gutierrez. Since there was no physical evidence against Holland, Gray's testimony was crucial to the State's case against Holland. Judge Woods found that the letter Gray wrote and gave to respondent was intended to be used by respondent as evidence to impeach Gray in the event that Gray testified against Holland. He made the finding that as a result of respondent's visits and

contacts with Gray, Gray did not testify against Holland. Judge Woods also found that Gray's interest was impaired because his failure to testify resulted in the loss of the opportunity to have his sentence reduced.

After making findings of fact, Judge Woods made conclusions of law. He found by clear and convincing evidence that respondent violated Rules 1.7, 3.4(c), 4.2, and 8.4(d). Judge Woods found that he violated Rule 1.7 [1] because the interests of Gray and Holland were adverse. Judge Woods concluded that respondent violated Rule 1.7 by failing to properly consult with his clients about the representation and by failing to adequately explain the conflict of interest and obtain the consent of his clients to the joint representation.

Judge Woods found that respondent violated Rules 3.4(c) and 4.2.[2] He found that by meeting with Gray without first

---

1. **RULE 1.7. CONFLICT OF INTEREST: GENERAL RULE.**
   (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
      (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
      (2) each client consents after consultation.
   (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
      (1) the lawyer reasonably believes the representation will not be adversely affected; and
      (2) the client consents after consultation.
   (c) The consultation required by paragraphs (a) and (b) shall include explanation of the implications of the common representation and any limitations resulting from the lawyer's responsibilities to another, or from the lawyer's own interests, as well as the advantages and risks involved.

2. **RULE 3.4. FAIRNESS TO OPPOSING PARTY AND COUNSEL.**
   A lawyer shall not:
      *       *       *       *       *       *
   (c) knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists[.]
   **RULE 4.2. COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL.**
   In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be

seeking the permission of his attorney, providing Gray with paper to write a letter to Judge Rymer, and continuing to meet with Gray after the court issued a protective order banning communication with him, respondent committed multiple violations of these rules. The court also found that these actions were a violation of Rule 8.4(d) [3] because they constituted conduct prejudicial to the administration of justice. He found that as a result of respondent's conduct, Gray, a crucial witness for the State, did not testify against Holland.

Judge Woods found that respondent had not violated Rule 3.3(a).[4] He concluded that in light of testimony by respondent that he was not trying to mislead the court when he testified on November 18, 1991, and in the absence of any action by Judge Rymer indicating that the court felt respondent was not candid at that hearing, respondent had not violated Rule 3.3(a).

In his conclusion, Judge Woods commented that the court accepted respondent's belief that he was acting in the best interests of his clients when he embarked on the course of action that culminated in these proceedings, but that an attorney cannot promote the interests of his or her clients at the expense of the Rules of Professional Conduct. The court noted that respondent was a "young, inexperienced lawyer who hadn't been involved in high profile or serious cases before," and that he was "in a little bit over his head" and probably did not know "what the rules of the road were." The court expressed regret that in respondent's zeal to promote what he presumed to be justice, he overlooked the responsibil-

---

represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

**3. RULE 8.4. MISCONDUCT.**
It is professional misconduct for a lawyer to:
    \*    \*    \*    \*    \*    \*
(d) engage in conduct that is prejudicial to the administration of justice[.]

**4. RULE 3.3. CANDOR TOWARD THE TRIBUNAL.**
(a) A lawyer shall not knowingly:
  (1) make a false statement of material fact or law to a tribunal[.]

ities of his profession, but that "at worst [respondent] was negligent."

Both Bar Counsel and respondent filed exceptions to Judge Woods' findings of fact and conclusions of law. Bar Counsel recommends that respondent be disbarred. Respondent suggests that if this Court sustains the charges, the appropriate sanction is a reprimand.

## II.

Initially, we note that this Court has original and complete jurisdiction over disciplinary proceedings. *Attorney Griev. Comm'n v. Powell,* 328 Md. 276, 287, 614 A.2d 102, 108 (1992); Md.Rule BV9(b). In this regard, "we ma[k]e an independent, detailed review of the complete record with particular reference to the evidence relating to the disputed factual finding." *Bar Ass'n v. Marshall,* 269 Md. 510, 516, 307 A.2d 677, 680–81 (1973). The ultimate decision as to whether an attorney has engaged in misconduct is to be made by this Court. *Attorney Griev. Comm'n v. Joehl,* 335 Md. 83, 88, 642 A.2d 194, 196 (1994).

### A. Exceptions of Bar Counsel

Bar Counsel filed exceptions to Judge Woods' findings and his conclusion that respondent did not violate Rule 3.3(a). Specifically, he excepts to the finding that respondent did not violate Rule 3.3(a) when he testified that he was unaware that Anthony Gray was represented by counsel at the time he spoke to him. He also excepts to Judge Woods' conclusion that respondent was at worst negligent in his involvement.

Respondent's testimony to the inquiry panel directly contradicts his testimony to the hearing court on November 18, 1991. Indeed, respondent acknowledged at the inquiry panel hearing that his statement before Judge Rymer was untrue. During the hearing on November 18th, respondent testified as follows:

"MR. SENGSTACK: Mr. Kent, are you telling this Court that you did not know that Mr. Gray was represented prior to your going to speak with him?

"MR. KENT: Your question was, was I sure of his representation, that he was still being represented; my answer is no, I am still not sure.

"[MR. SENGSTACK]: Mr. Kent, I think you are playing word games with me. Did you know that he was represented by counsel?

"[MR. KENT]: I think I'm your witness that you are trying to impeach.

"THE COURT: Ask the question again.

"[MR. SENGSTACK]: Did you have reason to believe that Mr. Gray was represented when you went to see him?

"[MR. KENT]: Did I have reason to believe he was represented?

"[MR. SENGSTACK]: Yes?

"[MR. KENT]: I will give you the same answer, no.

"[MR. SENGSTACK]: What did you have reason to believe with respect to his state of representation?

"[MR. KENT]: My understanding was he already pled guilty. Whether or not someone was continuing to represent him at that point, I was not aware of."

However, in his testimony to the inquiry board, respondent acknowledged several times that he was aware that Gray was represented by Ms. Gutierrez when he first met with him:

"MR. BOTLUK: Do you acknowledge now that you were aware that she was representing him, that Mr. Gray was represented by counsel at that time?

"MR. KENT: Yes.

\*　　\*　　\*　　\*　　\*　　\*

"MR. ELLISON: Mr. Kent, although some of my questions may sound redundant, I want to make sure I understand the facts, the first time you spoke with Mr. Gray on that Saturday, you've indicated that you recall it was sort of a spur of the moment thing?

"MR. KENT: Yes.

\*　　\*　　\*　　\*　　\*　　\*

"MR. ELLISON: And at that time you did realize that he was represented?

"MR. KENT: I knew that he had already entered a guilty plea and I knew that he hadn't been sentenced yet. So I assume he had counsel who would still be in the case.

\* \* \* \* \* \*

"MR. JACOBY: When you saw Mr. Gray the first time whatever day it might have been, did you have reason to believe that he was represented when you saw him?

"MR. KENT: Yes. In the context you're using it, yes."

Moreover, before the inquiry panel, respondent acknowledged that he had tried to "wheedle around" the questions put to him by Mr. Sengstack before Judge Rymer on November 18th:

"MR. JACOBY: ... Would it be likely then in a murder case when someone is represented by counsel and a plea of guilty is entered, particularly when it's contingent upon that person's testimony against co-defendants, that that attorney would continue to represent the client?

"MR. KENT: Yes.

"MR. JACOBY: So would this statement you gave to Mr. Sengstack and to Judge Rymer be true then?

"MR. KENT: No, not now in the context. In the context that I gave it, I was trying to wheedle around something at that time, the answer I was trying to get out there during the testimony was that I didn't know if it was active representation because as far as I was concerned the case was over. That's what I was trying to get across."

It is clear to us that respondent displayed a lack of candor to the tribunal. We therefore agree with Bar Counsel that Judge Woods' findings were clearly erroneous, grant Bar Counsel's exceptions, and hold that respondent violated Rule 3.3(a) of the Rules of Professional Conduct.

Bar counsel also excepts to Judge Woods' conclusion that respondent was at worst negligent in his involvement. In his conclusion, Judge Woods adopted the testimony of William H. Murphy, Jr., Esquire: "the Respondent was a 'real young,

inexperienced lawyer who hadn't been involved in high profile or serious cases before, who may have been in a little bit over his head, who probably didn't know what the rules of the road were and at worst was negligent in his involvement.'" Bar Counsel argues that respondent is neither young nor inexperienced, and that he has had sufficient legal experience to know "the rules of the road."

■ We agree with Bar Counsel that respondent's legal background was significant. Respondent had been a member of the Bar for six years prior to these incidents. He worked as a law clerk in the State's Attorney's Office throughout his law school career, worked as an Assistant State's Attorney in Baltimore City for two years, was a prosecutor in Prince George's County, and after leaving the State's employ, handled criminal cases in private practice as a member of the Federal Public Defender's Panel. Respondent has handled hundreds of criminal cases, including two murder cases prior to this incident. Respondent also deemed himself competent to handle cases that were potentially capital cases. We therefore agree with Bar Counsel and hold that Judge Woods' finding on this question was clearly erroneous. Moreover, we reject any argument that respondent's level of maturity or experience or his alleged lack of appreciation for his ethical obligations should excuse his violations of the Rules of Professional Conduct. See *Joehl,* 335 Md. at 93, 642 A.2d at 199.

We also agree with Bar Counsel that respondent's actions were all taken deliberately and constituted a blatant violation of the Rules of Professional Conduct. Respondent knew, or should have known, that he was violating his ethical obligations. In fact, respondent testified that he was aware of Rule 4.2 (Communication with Person Represented by Counsel), but that he nonetheless met with Gray in order to ascertain why he had pled guilty and why he agreed to testify against Holland.[5] The facts presented before the hearing

---

5. The record reflects that respondent scheduled a polygraph examination for Gray while he was still represented by Ms. Gutierrez. The fact

judge clearly establish that respondent intentionally and knowingly disregarded Judge Rymer's order and conversed with Gray on matters that may have affected Gray's vital interests. We grant Bar Counsel's exception and hold that respondent's actions were not merely negligent, but rather were intentional and in blatant violation of the Rules of Professional Conduct and in open disregard of court orders.

## B. Exceptions of Respondent

██ Respondent filed several exceptions to Judge Woods' findings of fact and conclusions of law. We find these exceptions to be without merit and overrule them.

Respondent excepts to the court's conclusion that he violated Rule 1.7. (Conflict of Interest: General Rule). He suggests that the Rule was not violated because he subjectively believed that neither client would be adversely affected by the dual representation. While conceding that "the technical rule had not been totally adhered to" and "the formality of Rule 1.7(b)(2) and 1.7(c) was not wholly complied with in its substantial terms," respondent appears to argue that he did not violate Rule 1.7 because neither client was harmed by the dual representation. He also maintains that Rule 1.7(c) was not violated because he never benefitted from the failure to advise Gray and Holland of a potential conflict. Finally, he argues that the Rule was not violated because, implicit in the conduct of Gray, Holland, and their families, he secured the "constructive consent of all" to the representation. Respondent urges this Court to find that there was no conflict of interest inherent in his joint representation of Gray and Holland. He further argues that all of the actions he took were taken in hopes of vindicating the allegedly unjustly accused men.

We find that the simultaneous representation of Gray and Holland raised an impermissible conflict of interest. The comment to Rule 1.7 states:

---

that the appointment was subsequently canceled does not significantly mitigate respondent's conduct.

An impermissible conflict may exist by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question. Such conflicts can arise in criminal cases as well as civil. The potential for conflict of interest in representing multiple defendants in a criminal case is so grave that ordinarily a lawyer should decline to represent more than one co-defendant.

Rule 1.7 cmt., Conflicts in Litigation. Judge Woods found, and we agree, that not only a potential conflict but an actual conflict of interest existed. Respondent was Holland's attorney. Gray had pled guilty to the rape, murder, and robbery of Ms. Pellicano, and implicated Holland as the main perpetrator of the crime. Gray was the State's eyewitness linking Holland to the crime. Thus, there was clearly an acute conflict with respect to the interests and legal positions of the two defendants.

Nonetheless, respondent agreed to represent both Gray and Holland. He made no attempt to inform his clients of the conflict of interest and did not obtain a waiver of the conflict prior to undertaking the joint representation. *See* Rule 1.7(c). Assuming the clients could consent to the dual representation under the circumstances described, we find no knowing and intelligent waiver by Gray of the right to separate counsel. *See Glasser v. United States,* 315 U.S. 60, 71, 62 S.Ct. 457, 465, 86 L.Ed. 680 (1942). Despite respondent's professed opinion to the contrary, it should have been clear to him that it was impossible to zealously represent the interests of both Gray and Holland simultaneously. The text writers are generally in agreement on this issue:

"As a general rule, whenever one codefendant makes a statement which is exculpatory or which inculpates a codefendant, they cannot be represented by the same attorney because a conflict exists.

"Thus, there also is a conflict where one defendant gives a statement saying that the other was the instigator of the crime, they were involved in a separate crime together, one

indicates a desire to become a prosecution witness, one says that the other is more guilty, or the statements raise inconsistent defenses."

John W. Hall, Jr., *Professional Responsibility of the Criminal Lawyer* § 13.27 (1987) (footnotes omitted).[6]

Judge Woods found that respondent met with Gray once on October 24, 1991, and twice on October 31, 1991. On the latter date, respondent provided Gray with paper to write a letter to Judge Rymer. The letter from Gray indicated that respondent informed Gray that there was a lack of evidence against him, that he wished to renounce his plea agreement, and that he wanted a new lawyer. Judge Woods found that respondent's discussions with Gray prompted him to take these actions.

Respondent argues that the dual representation did not harm Gray. It is apparent to us, however, that Gray was harmed. Gray had pled guilty and had given a detailed confession. His only chance to avoid the double life sentence that was ultimately imposed was to testify for the State in Holland's trial. By renouncing the plea agreement and refusing to testify in Holland's trial, Gray lost the opportunity for a reduced sentence. It is clear that respondent's dual representation of Gray and Holland presented an insurmountable conflict that benefitted Holland at the expense of Gray. It was respondent's divided loyalty that harmed Gray. The record clearly supports Judge Woods' finding that respondent violated Rule 1.7, and we overrule respondent's exception.

Respondent also objects to the hearing judge's conclusion that he violated Rules 3.4(c) (Fairness to Opposing Party and Counsel) and 4.2 (Communication with Person Represented by Counsel). His position is that the December 7th meeting did not take place, and that the October 24th and 31st meetings

---

**6.** The suggestion that a conflict is obviated when the confessing defendant renounces the statement is not applicable to the situation where counsel participates in the renunciation of the statement. *See, e.g., United States v. Cale*, 418 F.2d 897, 899 (6th Cir.1969), *cert. denied*, 397 U.S. 1015, 90 S.Ct. 1250, 25 L.Ed.2d 430 (1970).

"were born of youthful zeal and a burning psychological desire to be of help."

■ Respondent asserts that Judge Woods' finding that he met with Gray on December 7, 1991, in violation of the protective order was not supported by clear and convincing evidence. In a disciplinary action, the factual findings of the hearing judge are *prima facie* correct and will not be disturbed on appeal unless they are clearly erroneous. *Attorney Griev. Comm'n v. Harris,* 310 Md. 197, 208, 528 A.2d 895, 900 (1987), *cert. denied,* 484 U.S. 1062, 108 S.Ct. 1020, 98 L.Ed.2d 985 (1988). The hearing judge is in the best position to determine the credibility of witnesses. *Id.* at 210, 528 A.2d at 901. Based on our review of the record, we find that there is clear and convincing evidence to support the finding of Judge Woods. He heard extensive testimony on this issue, and we cannot find that he was clearly erroneous.

■ Respondent next excepts to Judge Woods' finding that he violated Rule 4.2 (Communication with Person Represented by Counsel). He tells us that his conduct was "born of youthful zeal and a burning psychological desire to be of help." He does acknowledge, however, that it is a violation of the ethical rules for a lawyer, in the course of his representation of a client, to communicate with another person known to be represented by counsel on the subject matter of the representation, without the prior consent of the other lawyer or authorization by law to do so. In evaluating conduct under the ethical rules, the motive of the lawyer in making the proscribed overture is immaterial. The Rule protects parties from contacts that are well meaning but misguided as well as those that are intentionally improper, and is designed to prevent "a person from being deprived of the advice of retained counsel by bypassing retained counsel." *In re McCaffrey,* 275 Or. 23, 549 P.2d 666, 668 (1976). Judge Woods found that respondent communicated about the subject of representation with Gray, knowing Gray was represented by another lawyer in the matter, without the consent of Gray's

lawyer. We accordingly overrule respondent's exception and hold that respondent violated Rules 3.4 and 4.2.

■ Respondent's final argument is that he did not violate Rule 8.4(d) (Misconduct). Respondent claims that he did not engage in conduct prejudicial to the administration of justice because his intent was to bring about the acquittal of individuals he believed to be innocent. Regardless of respondent's personal beliefs about the guilt or innocence of the defendants, he is bound to uphold the Rules of this Court. Respondent has clearly violated the Rules of Professional Conduct and has engaged in conduct prejudicial to the administration of justice. As we have noted, evidence in the record indicates that he had unauthorized meetings with Gray in order to prevent him from testifying for the State, and that he openly disobeyed not only his ethical obligations, but also orders of the court. Tampering with a witness and violating court orders are acts that strike at the very object and purpose for which the courts are established. Respondent's actions impeded an important interest of the justice system—the prosecution of crimes. We are unpersuaded by respondent's arguments and hold that respondent violated Rule 8.4(d) by engaging in conduct prejudicial to the administration of justice.

### III.

■ Multiple representation that results in a conflict of interest is a violation of the Rules of Professional Conduct as well as the Sixth Amendment right to counsel. It is a violation of the Rules of Professional Conduct for an attorney to represent an individual whose interests are adverse to those of another client. While the law is clear that the mere representation by one lawyer of two defendants charged with the same offenses does not of itself constitute a conflict of interest, whether or not a conflict exists must be determined by the facts of each individual case. *Austin v. State,* 327 Md. 375, 609 A.2d 728 (1992); *In re Special Investigation No. 231,* 295 Md. 366, 455 A.2d 442 (1983); *McCoy v. Warden,* 234 Md. 616, 198 A.2d 245 (1964); *Pressley v. State,* 220 Md. 558, 155

A.2d 494 (1959). The authorities are generally in agreement, however, that a conflict of interest exists where a single attorney in a criminal case represents both the defendant and the chief witness for the State in the same case. For excellent and comprehensive discussions of conflict of interest and multiple representation, see *Austin,* 327 Md. at 387–89, 609 A.2d at 733–35, and *Gee v. State,* 93 Md.App. 240, 248–57, 611 A.2d 1081, 1085–90 (1992). *See also People v. Mattison,* 67 N.Y.2d 462, 503 N.Y.S.2d 709, 494 N.E.2d 1374, 1378 ("[A] plea by one defendant in exchange for testimony against the other in the same matter is virtually certain to place lawyers involved in representing both in an untenable position." (citations omitted)), *cert. denied,* 479 U.S. 984, 107 S.Ct. 571, 93 L.Ed.2d 575 (1986).

In *Austin,* Judge Eldridge, writing for the Court, noted:
[T]here is one multiple representation situation where the courts have generally taken the position that an actual conflict of interest exists. That is where an attorney ... represent[s] in the same criminal case both the defendant and a codefendant (or other individual) who testifies adversely to the defendant.

*Austin,* 327 Md. at 387, 609 A.2d at 733. The dangers inherent in the simultaneous representation of a defendant and a State's witness are legion. It is obvious that when the testimony of one party will be detrimental to another, an attorney is in an untenable position in representing both individuals. To properly advise one client will ordinarily result in a breach of an obligation to the other client. The duty of loyalty to the witness, and the restraint upon defense counsel's cross-examination of the witness because of the attorney-client privilege, has been held to be a conflict of interest. *In re Garber,* 95 N.J. 597, 472 A.2d 566, 572 (1984); *In re Cohn,* 46 N.J. 202, 216 A.2d 1, 7 (1966).

In *Gee,* the Court of Special Appeals noted:
"Additional conflict problems may arise after indictment but prior to trial. A defendant, recognizing his guilt, may wish to pursue the possibility of disposing of the charges

against him without a trial. It is often in the defendant's best interest to cooperate with the prosecution as a witness against a codefendant in exchange for a reduced plea or recommendation of more lenient treatment at sentencing. *The assistance of independent counsel in making this determination is vital if the defendant is to make an intelligent choice. An attorney representing codefendants or associates who would be damaged by the defendant's testimony would necessarily find himself in an untenable position.* To advise a defendant-witness to cooperate would hurt his other clients. To advise a defendant-witness not to cooperate, when his best interests dictate otherwise, would be to render ineffective assistance."

*Gee,* 93 Md.App. at 256–57, 611 A.2d at 1090 (quoting Girgenti, *Problems of Joint Representation of Defendants in a Criminal Case,* 54 St. John's L.Rev. 55, 64–65 (1979)) (emphasis in original) (footnotes omitted in original). In a case similar to the instant one, the New Jersey Supreme Court stated:

Not only is it unethical for counsel to improperly influence a witness in his testimony but it is as well improper for him to place himself in a position where he could influence a witness in a manner to color his testimony favorable to his client.

*In re Cohn,* 216 A.2d at 7.

Effectiveness of cross-examination may be impaired by joint representation. *See Glasser v. United States,* 315 U.S. 60, 73, 62 S.Ct. 457, 466, 86 L.Ed. 680 (1942) (finding that the inability of counsel to effectively cross-examine a witness amounted to a conflict of interest). In the event that Gray had decided to testify on behalf of the State at the trial of Holland, respondent would have had to cross-examine Gray and attempt to discredit his testimony. Significantly, Judge Woods found that respondent assisted in the creation of the letter to Judge Rymer, a document that he could have used to impeach Gray, if necessary. The dual representation enabled respondent to receive confidential information from each client that could be used to the advantage of Holland to the detri-

ment of Gray, subjecting Gray to potential charges of perjury. Had the occasion arisen, the ability of respondent to effectively cross-examine Gray would have been severely impaired.

An actual conflict of interest is a clear violation of Rule 1.7. In addition, under some circumstances, the *appearance* of a conflict of interest may constitute an ethical violation. In order to maintain public confidence in the legal system, lawyers must avoid not only actual acts of misconduct but even the type of behavior that can suggest misconduct. *In re Garber*, 472 A.2d at 573–74; *In re Cohn*, 216 A.2d at 7; *In re McCaffrey*, 549 P.2d at 668. If the public were to believe that Holland and Long were acquitted not because there was a reasonable doubt as to their guilt, but because respondent improperly influenced the outcome of the trial by sabotaging Ms. Gutierrez's representation of Gray and tampering with the State's key witness, surely the image of the judicial system would be tainted. Respondent's concurrent representation of Gray and Holland gave rise to an opportunity to influence a key witness, creating a public perception that justice had been compromised.

The New Jersey Supreme Court has had several occasions to consider similar conduct. In *In re Garber*, 95 N.J. 597, 472 A.2d 566 (1984), the court considered the appearance of impropriety created by an attorney simultaneously representing a material witness and a party accused of crime. The court held that under no circumstances may an attorney with any propriety ever represent an eyewitness or material witness to a crime and also represent or become professionally associated with an individual charged with the commission of the same crime. *Id.*, 472 A.2d at 572. The court observed:

> The crux of respondent's ethical violation here does not turn on the wholly pragmatic or fortuitous outcome of legal events. Rather, the essence of the ethical transgression is the compromised and equivocal professional posture of the attorney. There flows from this an apparent sapping of moral integrity and clouding of intellectual focus, which ultimately undermine the attorney's ability to give unalloyed

legal advice to his client. *Equally damaging is the attendant public perception that, as a consequence of respondent's compromised position, professional probity has been diluted and the administration of justice perverted.*
*Id.,* 472 A.2d at 574 (emphasis added). In a similar vein, in *In re Cohn,* 216 A.2d at 7, the New Jersey Supreme Court noted:

> Further, and perhaps even more importantly, the impact on the public of Cohn's representation of both the State's principal witness and the defendant in a revocation hearing would not be conducive to respect for law, order, and the judicial process. Public knowledge of those relationships could and probably would engender, at the least, a serious doubt about the integrity of the proceeding.

As previously noted, multiple representation in a criminal case may deprive a defendant of his right to counsel under the Sixth Amendment and the Maryland Declaration of Rights. *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981); *Austin,* 327 Md. at 381, 609 A.2d at 730–31. The question of whether Gray was deprived of his right to effective assistance of counsel is not before us and we decline to speculate on the merits of any post-conviction proceeding if Gray chooses to proceed and raise the effectiveness of respondent's representation. We note, however, that a recanting witness in Gray's position is particularly in need of scrupulous and untainted legal advice because he may face charges of false swearing, perjury, conspiracy, or obstruction of justice in addition to his exposure to a harsher sentence than the one originally bargained for in exchange for testimony. *See Kent v. State,* 11 Md.App. 293, 299, 273 A.2d 819, 822 (1971); *In re Garber,* 472 A.2d at 570. Moreover, as reflected in the letter Gray wrote to Judge Rymer, Gray was of limited education and ability to communicate. The trial transcript also reflects his particular susceptibility to influence and persuasion on the part of the last person who speaks to him. Gray's limitations magnify his need for undivided loyalty.

Respondent contends that the conduct of Gray, Holland, and their families constituted "constructive consent,"

a term he neither defines nor supports with any authority. Although the hearing judge found, and we agree, that neither client consented to the dual representation, we nonetheless note that certain conflicts of interest cannot be cured through disclosure or client consent. Particularly where the public interest is involved, such consent may be considered legally ineffective to waive a conflict of interest. "[Consent] is [not] relevant when the subject matter is crime and when the public interest in the disclosure of criminal activities might thereby be hindered." *In re Garber*, 472 A.2d at 575 (alteration in original); *see* Am. Bar Ass'n, *ABA Standards for Criminal Justice* 159–70 (3d ed. 1993) (Defense Function Standard 4–3.5 Conflict of Interest). Under the circumstances of this case, no disclosure or consent could have permitted respondent to represent Gray.

## IV.

Having determined that respondent has violated Rules 1.7, 3.3(a), 3.4(c), 4.2, and 8.4(d), we now turn to the question of sanctions. Bar Counsel recommends respondent be disbarred. Respondent suggests a reprimand.

It is well settled that the purpose of disciplinary proceedings against an attorney for professional misconduct is to protect the public and to preserve public confidence in the legal profession, rather than to punish the lawyer or to provide a basis upon which to impose liability. *Attorney Griev. Comm'n v. Hamby*, 322 Md. 606, 611, 589 A.2d 53, 56 (1991); *Attorney Griev. Comm'n v. Kolodner*, 316 Md. 203, 208, 557 A.2d 1332, 1334 (1989). Imposition of sanctions for misconduct protects the public by demonstrating to members of the legal profession the type of conduct that will not be tolerated. *Hamby*, 322 Md. at 611, 589 A.2d at 56. The severity of the sanction is to be determined by the facts and circumstances of each case. *Attorney Griev. Comm'n v. Myers*, 333 Md. 440, 447, 635 A.2d 1315, 1318 (1994). Moreover, we have often noted that sanctions represent the fulfillment by this Court of its responsibility "to insist upon the

maintenance of the integrity of the bar and to prevent the transgressions of an individual lawyer from bringing its image into disrepute." *Maryland St. Bar Ass'n v. Agnew,* 271 Md. 543, 549, 318 A.2d 811, 814 (1974).

We have concluded that respondent committed violations of Rules 1.7, 3.3(a), 3.4(c), 4.2, and 8.4(d), and we agree with Bar Counsel's assessment of the egregious nature of respondent's misconduct. Respondent violated his duties not only to his clients and the legal profession, but also to the public at large. According to Standard 6.31 of the American Bar Association's (ABA) Standards for Imposing Lawyer Sanctions, disbarment is proper for several of these violations. The Standard provides:

> 6.31 Disbarment is generally appropriate when a lawyer:
>
> (a) intentionally tampers with a witness and causes serious or potentially serious injury to a party, or causes significant or potentially significant interference with the outcome of the legal proceeding[.]

[Manual] Laws.Man. on Prof.Conduct (ABA/BNA) No. 119, at 01:833 (June 17, 1992) [hereinafter ABA/BNA Lawyers' Manual].

Respondent repeatedly communicated with Gray and carried messages on his behalf to Judge Rymer despite the fact that he knew Gray was represented by counsel. These actions were apparently designed to ensure that Gray would renounce his plea agreement and refuse to testify against Holland. Respondent tampered with Gray, the State's most important witness. As a result of this tampering, he deprived the State of the testimony of the material witness and virtually ensured that the two individuals whom Gray had previously identified as murderers, robbers, and rapists would be acquitted. Gray himself was convicted of these crimes and two life sentences were imposed upon him. It is difficult to imagine a more serious interference with the outcome of legal proceedings.

Standard 4.31 of the ABA's Standards for Imposing Lawyer Sanctions provides:

4.31 Disbarment is generally appropriate when a lawyer, without the informed consent of client(s):

\* \* \* \* \* \*

(b) simultaneously represents clients that the lawyer knows have adverse interests with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to a client[.]

ABA/BNA Lawyers' Manual, *supra*, at 01:819. Although respondent claims he was only trying to prevent innocent men from conviction of crimes they did not commit, the evidence indicates that his actions were taken primarily to benefit his original client, Holland. Respondent testified that, as far as he was concerned, Gray's case was essentially over. In his view, as a result of Gray's plea agreement, Gray's fate was sealed. Thus, his simultaneous representation could only have been undertaken with the intention of benefitting Holland.

Considered in the context of the entire proceedings, respondent's violation of Rule 3.3(a), misrepresentation to the court, was no less serious. *Attorney Griev. Comm'n v. Boyd*, 333 Md. 298, 321–22, 635 A.2d 382, 393–94 (1994); *Myers*, 333 Md. at 449–51, 635 A.2d at 1319–20. A lawyer is an officer of the court and as such is expected to abide by the rules of the court. By making false statements to the court, a lawyer violates the most fundamental obligation an officer of the court owes the legal system. Standard 6.11 of the ABA's Standards for Imposing Lawyer Sanctions provides:

6.11 Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

ABA/BNA Lawyers' Manual, *supra*, at 01:830. Respondent claimed he was unaware that Gray was represented by counsel during the hearing on the motion for protective order. Yet his actions and later testimony indicate that he knowingly interfered in Ms. Gutierrez's representation of Gray. We can

only assume that testimony during the November 18th hearing was intended to keep the court from granting the protective order, and to prevent the court from imposing sanctions on him for his behavior.

This case is particularly aggravated by the effect of respondent's conduct on the operation of the criminal justice system and the prosecution of crime. Respondent's behavior has had a devastating effect on the functioning of the legal system in the Pellicano rape-murder case. He has impeded the functioning of the legal system. Such conduct can only diminish the public's confidence in the legal profession.

Respondent's arguments that he was inexperienced and merely negligent do not mitigate his conduct. Nor does his claim that he was acting out of a genuine belief that he was aiding innocent men excuse his ethical breaches of the Rules. As previously indicated, we find respondent neither inexperienced nor merely negligent. All lawyers are bound to follow the Rules of Professional Conduct. Respondent's serious multiple violations of the Rules have affected the public interest and have prejudiced the administration of justice.

The purpose of this proceeding is to protect the public and to preserve the professional integrity and purity of the Bar. The confidence of the public in the judicial system depends upon the maintenance of the standards of conduct and high ideals in this honored profession. We believe that the appropriate sanction in this case is the ultimate one, disbarment.

The respondent is ordered disbarred.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15(c), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST MICHAEL GAYHART KENT.

CHASANOW and BELL, JJ., would impose an indefinite suspension rather than disbarment as the appropriate sanction.